[Cite as *Alexander v. Cleveland Clinic Found.*, 2011-Ohio-2924.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 95727

## NATHAN ALEXANDER

### PLAINTIFF-APPELLANT

vs.

## CLEVELAND CLINIC FOUNDATION

### DEFENDANT-APPELLEE

## JUDGMENT:
## REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-706351

**BEFORE:** Jones, J., Blackmon, P.J., and Boyle, J.

**RELEASED AND JOURNALIZED:** June 16, 2011

**ATTORNEY FOR APPELLANT**

Michael T. Conway
Michael T. Conway and Co.
3456 Sandlewood Drive
Brunswick, Ohio 44212


**ATTORNEYS FOR APPELLEE**

Christopher G. Keim
Michael N. Chesney
Kelly S. Lawrence
Frantz Ward LLP
2500 Key Center
127 Public Square
Cleveland, Ohio 44114

LARRY A. JONES, J.:

{¶ 1} Plaintiff-appellant, Nathan Alexander ("Alexander"), appeals the trial court's judgment granting summary judgment in favor of the Cleveland Clinic Foundation, LLC ("Clinic"). Finding merit to the appeal, we reverse and remand.

<u>Procedural History and Facts</u>

{¶ 2} In 2002, the Clinic hired Alexander as a security guard. In 2006, the Clinic

promoted him to the position of police officer with the Clinic police department ("CCPD"). The Clinic maintains a non-unionized, private police department chartered by the state of Ohio, charged with the responsibility of providing a safe and secure environment for all Clinic patients, visitors, and employees.

{¶ 3} On September 9, 2009, Alexander was in his police uniform working on the main Clinic campus directing traffic. Alexander approached pedestrians waiting to cross East 86th Street and asked them to wait until he stopped traffic. Daria Hubach ("Hubach"), a Clinic employee, had just left an employee parking garage and was traveling south in her car on East 86th Street. After Alexander had stopped the pedestrians, he was walking over to stop southbound traffic when Hubach's car approached the intersection. Alexander testified at deposition that he motioned Hubach to stop. Hubach testified at deposition that she thought Alexander was merely motioning her to slow down. She proceeded to drive into the intersection, at which time Alexander approached her moving car, yelled "Stop!" and hit her driver's side mirror. Instead of stopping, Hubach kept driving.

{¶ 4} Hubach filed a complaint with the CCPD regarding Alexander's actions in striking her car mirror. An officer took Hubach's statement and photographed the car mirror, which had been dislodged from its housing.

{¶ 5} The next day, Alexander's supervisor, Lieutenant William Neath, and Commander Robert Sims ("Sims") of the Clinic's internal affairs department, met with

Alexander to discuss Hubach's complaint. Alexander provided a written statement. Sims informed Alexander that he was being suspended for three days.

{¶ 6} Sims began to investigate the complaint and interviewed several department police officers and reviewed videotaped footage of the incident, pertinent reports and statements, and Alexander's work history. Sims discovered that in August 2008, Alexander had been ordered to attend counseling after he yelled at a bus driver. According to the report of that incident, Alexander was directing traffic when a Clinic bus, making a turn, grazed Alexander's right leg, knocking him forward. Alexander yelled at the bus driver to "learn how to f****** drive." The bus driver complained about Alexander, who was not injured in the incident. At that time, the Clinic cited Alexander for two violations of the Clinic's policy. Alexander was referred to counseling.

{¶ 7} As a result of the investigation into the incident with Hubach, Sims concluded that Alexander had committed the following policy infractions:

"121-II-W Improper or negligent acts that cause damage to equipment, or property of Cleveland Clinic, employees, patients or visitors;

"Policy 121-II-X Failure to conform to professional ethics;

"Policy 121-II-EE Serious failure of good behavior;

"Standard of Conduct #3 - Cooperative Behavior and Interpersonal Relations;

"Standard of Conduct #6 - Know and Obey Laws and Organizational Directives;

"Standard of Conduct #8 - Code of Ethic and Behavior."

{¶ 8} Sims recommended that Alexander receive a mandatory referral to the Clinic's Employee Assistance Program ("EAP"), with an evaluation for anger management. He then referred the matter to the chief of police, John Kalavsky ("Kalavsky"), and the Clinic's human resources department.

{¶ 9} Sims and Kalavsky subsequently met with the Clinic's vice-president of human resources, Julie Judge ("Judge"). Judge suggested Sims and Kalavsky meet with Alexander to "ascertain if he had given some thought to his conduct and behavior, and if he had any thoughts about whether he would have done things differently" in trying to stop Hubach's car from entering the intersection. Kalavsky testified at deposition that he planned to "afford [Alexander] an opportunity that if he had made clear that there were other options, and that his behavior was inappropriate, that he may have been given consideration for suspension." The three also discussed a referral to the EAP for anger management counseling as alternatives to terminating Alexander's employment.

{¶ 10} On September 23, Alexander met with Kalavsky. During the meeting, Alexander maintained his actions on September 9 were justified. Alexander explained that he had merely been trying to get Hubach to obey his commands and was concerned about pedestrian safety in making the split-second decision to try and stop her car.

{¶ 11} Kalavsky inquired whether Alexander would conduct himself in the same manner if a similar situation should happen again. Alexander replied that he would act

differently in the future because his actions had gotten him suspended, but continued to maintain he had done nothing wrong. Kalavsky testified at deposition that he told Alexander that the CCPD must perform their duties in a manner different from traditional police due to the Clinic being a "hospital policing environment." He also informed Alexander that the situation warranted termination but asked him to go home and think further about his actions with the hopes that Alexander would be willing to take some responsibility for his conduct.

{¶ 12} Finally, Kalavsky asked Alexander whether he was tape-recording the conversation, to which Alexander replied "no." The chief told Alexander that he did not have the authority or the chief's authorization to tape the conversation.[1]

{¶ 13} Two days later, on September 25, Alexander again met with the chief and Sims. Alexander repeated that he had done nothing wrong in the Hubach incident. It was at this time that Alexander was terminated from the CCPD. Kalavsky concluded that Alexander's position as a police officer should be terminated in light of multiple violations of Clinic policy and departmental standards of conduct. Kalavsky informed Alexander he could appeal his termination within the Clinic's established grievance system.

{¶ 14} Alexander did not appeal his termination with the Clinic, but subsequently filed suit against the Clinic for wrongful termination. The Clinic moved for summary judgment, which the trial court granted finding that no genuine issue of material fact remained for trial.

---

[1] The Clinic learned that Alexander had tape-recorded meetings with his superiors only after Alexander filed suit against the Clinic.

**{¶ 15}** Alexander appeals, raising the following assignments of error for our review:

"I.   The trial court committed prejudicial and reversible error by admitting unreliable and unqualified defense expert witness testimony into the record for consideration as evidence in support of the defendant-appellee's motion for summary judgment.

"II.   The trial court committed prejudicial and reversible error when it granted the defendant's motion for summary judgment given there is a genuine factual dispute in the record and the defendant-appellee is not entitled to judgment as a matter of law."

**{¶ 16}** We will discuss the second assignment of error first because it is dispositive of the appeal.

## Summary Judgment

**{¶ 17}** In the second assignment of error, Alexander argues that the court erred in granting summary judgment to the Clinic.   For the reasons that follow, we agree.

**{¶ 18}** An appellate court reviews a trial court's decision on a motion for summary judgment de novo.   *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 1996-Ohio-336, 671 N.E.2d 241.   Summary judgment is appropriate when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party.   *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369–370, 1998-Ohio-389, 696 N.E.2d 201, citing *Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 1995-Ohio-286, 653 N.E.2d 1196, paragraph three of the syllabus.   The evidence must be viewed in the light most favorable to the nonmoving

party. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 375 N.E.2d 46.

{¶ 19} In Ohio, absent an employment contract, an employee is at will and may be terminated at anytime for any lawful reason or for no reason at all. *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 102, 483 N.E.2d 150, at fn. 1, citing *Henkel v. Edn. Research Council* (1976), 45 Ohio St.2d 249, 255, 344 N.E.2d 118. However, an at-will employee may not be discharged or disciplined for reasons violative of a statute or public policy. *Greeley v. Miami Valley Maintenance Contrs.* (1990), 49 Ohio St.3d 228, 551 N.E.2d 981, paragraph two of the syllabus.

{¶ 20} In his lawsuit, Alexander alleged that the Clinic wrongfully discharged him in violation of public policy. To establish his claim, Alexander must show: 1. That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); 2. That his dismissal jeopardized the public policy (the jeopardy element); 3. His dismissal was motivated by conduct related to the public policy (the causation element); and 4. The Clinic lacked overriding legitimate business justification for the dismissal (the overriding justification element). *Collins v. Rizkana*, 73 Ohio St.3d 65, 1995-Ohio-135, 652 N.E.2d 653, citing H. Perritt, The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie? (1989), 58 U.Cin.L.Rev. 397, 398-399.

{¶ 21} The clarity and the jeopardy elements are questions of law and policy to be

determined by the court. *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 151, 1997-Ohio-219, 677 N.E.2d 308, citing *Collins* at 70. The causation and overriding-justification elements are questions of fact to be determined by the trier of fact. Id.

{¶ 22} Alexander claims that public policy dictates that police officers enforce the laws of the state of Ohio. See *Barnes v. Cadiz*, Harrison App. No. 01531CA, 2002-Ohio-1534, ¶ 15, citing *State v. Byomin* (1958), 106 Ohio App. 393, 154 N.E.2d 823, R.C. 737.18 and 737.19. He also claims that dismissing a police officer for enforcing the laws would jeopardize the public policy of wanting police officers to enforce Ohio laws. We find merit to this argument. Although the Clinic argues that Alexander was not enforcing any law when he hit the car mirror and even though striking a car's mirror may not be an effective, or even safe, means by which to enforce traffic laws, we cannot say that he was acting "outside" the law, breaking the law, or as the Clinic argues "crossing the line" when he made a split-second decision to try and get Hubach to stop after ignoring a police officer's command.

{¶ 23} At deposition, Kalavasky testified as follows:

"Counsel for Alexander: My client was in the performance of his lawful duties as a police officer during this incident with Hubach on September 9, 2002, can we agree on that?"

"Kalavasky: Yes."

{¶ 24} Both Kalavasky and Judge agreed at deposition that a police officer is required to make split-second judgments about how to enforce the laws. Alexander, in his statement,

wrote that Hubach was traveling between 30-35 m.p.h. approaching the intersection and, after he made eye contact with her and directed her to stop, it became apparent to him that she was not going to comply with his signal to stop. He further stated: "I made contact with the vehicle for the exclusive purpose of gaining the operator's full attention and understanding my order to stop. However, nothing worked and the vehicle proceeded through the crosswalk * * *."

{¶ 25} Kalavasky clearly stated that Alexander was terminated only due to what happened with the Hubach incident; thus, he was not terminated due to his previous performance evaluations or for prior discipline stemming from his swearing at a bus driver who had just hit him. Moreover, although Alexander's annual performance evaluations showed areas that could be improved, they were overall positive evaluations in which his overall performance was rated "fully met expectations" in April 2007 and March 2008 and "mostly met expectations" in March 2009. We also note that a month prior to his termination, the CCPD gave Alexander a certificate of recognition, naming him a training officer.

{¶ 26} The Clinic also argues that the CCPD gave Alexander multiple chances to admit his wrongdoing with regard to Hubach and that if he had acknowledged his error he may not have been terminated. Alexander, however, remains steadfast in his position that he acted appropriately. We find that whether Alexander reacted wrongly towards Hubach when she ignored a police command is a matter of fact that is better suited for a jury to decide.

{¶ 27} In addition, although the Clinic's expert opined that Alexander was not upholding any Ohio law during the incident, a reasonable jury could disagree. Again it is a question of fact whether Alexander's dismissal was motivated by conduct related to public policy and whether the Clinic lacked an overriding legitimate business justification for his termination. Even though Alexander has the reciprocal burden to demonstrate causation and the lack of an overriding justification once the Clinic shows otherwise through depositions, see *Barnes* at id., we find that Alexander has been able to meet his burden to overcome summary judgment in this case.

{¶ 28} Therefore, we find that Alexander submitted evidence sufficient to demonstrate a triable question of fact; therefore, the trial court erred when it granted summary judgment in favor of the Clinic.

{¶ 29} The second assignment of error is sustained. Based on the disposition of the second assignment of error, the first assignment of error is moot. See App.R. 12(A)(1)(c).

{¶ 30} Accordingly, judgment is reversed and the case remanded for proceedings consistent with this opinion.

It is ordered that appellant recover of appellee his costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


LARRY A. JONES, JUDGE

PATRICIA A. BLACKMON, P.J., CONCURS;
MARY J. BOYLE, J., DISSENTS WITH
SEPARATE OPINION


MARY J. BOYLE, J., DISSENTING:

{¶ 31} I respectfully dissent from the majority's opinion. Unlike the majority, I find that Alexander has failed to satisfy the first factor in support of his claim that the Clinic wrongfully discharged him in violation of public policy. I do not agree with the majority's acceptance of Alexander's stated public policy in support of the clarity element enumerated under *Collins v. Rizkana*, 73 Ohio St.3d 65, 1995-Ohio-135, 652 N.E.2d 653. While the discharge of a police officer for enforcing the laws of Ohio would violate public policy, this case does not fall within that category.

{¶ 32} The Clinic did not discharge Alexander for enforcing the law. To the contrary, the investigation leading to Alexander's termination arose because of Alexander's misconduct, wherein he improperly struck Hubach's car mirror. As recognized by the majority, his conduct violated five distinct Clinic policies. In my opinion, five policy infractions clearly supports the Clinic's position that Alexander "crossed the line" during the performance of his

duties and that such action does not fall within the realm of "enforcing the law." Therefore, because I find that no clear public policy exists that prevents an employer from discharging an employee for ignoring employer policies in the performance of his or her duties, I would affirm the trial court's grant of summary judgment in favor of the Clinic.