[Cite as *Alexander v. Cleveland Clinic Found.*, 2012-Ohio-1737.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 95727

# NATHAN ALEXANDER

### PLAINTIFF-APPELLANT

vs.

# CLEVELAND CLINIC FOUNDATION

### DEFENDANT-APPELLEE

## JUDGMENT:
## REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-706351

**BEFORE:** Jones, J., Blackmon, A.J., and Boyle, J.

**RELEASED AND JOURNALIZED:** April 19, 2012

**ATTORNEY FOR APPELLANT**

Michael T. Conway
Michael T. Conway and Co.
3456 Sandlewood Drive
Brunswick, Ohio 44212


**ATTORNEYS FOR APPELLEE**

Christopher G. Keim
Michael N. Chesney
Kelly S. Lawrence
Frantz Ward LLP
2500 Key Center
127 Public Square
Cleveland, Ohio 44114

LARRY A. JONES, SR., J.:

**{¶1}** This appeal is before this court on remand from the Ohio Supreme Court for application of *Dohme v. Eurand Am., Inc.*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825.

**{¶2}** In *Alexander v. Cleveland Clinic Found.*, 8th Dist. No. 95727, 2011-Ohio-2924, ("*Alexander I*"), this court reversed the trial court's grant of summary judgment in favor of the Cleveland Clinic Foundation, LLC ("Clinic"). The Clinic appealed to the Ohio Supreme Court, which accepted the discretionary appeal. The Court vacated our decision in *Alexander I* and remanded the case to us for application of *Dohme*. *Alexander v. Cleveland Clinic Found.*, 130 Ohio St.3d 401, 2011-Ohio-5936, 958 N.E.2d 945.

**{¶3}** Here are the facts, as set forth in *Alexander I*:

**{¶4}** In 2002, the Clinic hired Nathan Alexander ("Alexander") as a security guard. In 2006, the Clinic promoted him to the position of police officer with the Clinic police department ("CCPD"). The Clinic maintains a non-unionized, private police department chartered by the state of Ohio, charged with the responsibility of providing a safe and secure environment for all Clinic patients, visitors, and employees.

**{¶5}** On September 9, 2009, Alexander was in his police uniform working on the main Clinic campus directing traffic. Alexander approached pedestrians waiting to cross East 86th Street and asked them to wait until he stopped traffic. Daria Hubach

("Hubach"), a Clinic employee, had just left an employee parking garage and was traveling south in her car on East 86th Street. After Alexander had stopped the pedestrians, he was walking over to stop southbound traffic when Hubach's car approached the intersection. Alexander testified at deposition that he motioned Hubach to stop. Hubach testified at deposition that she thought Alexander was merely motioning her to slow down. She proceeded to drive into the intersection, at which time Alexander approached her moving car, yelled "Stop!" and hit her driver's side mirror. Instead of stopping, Hubach kept driving.

{¶6} Hubach filed a complaint with the CCPD regarding Alexander's actions in striking her car mirror. An officer took Hubach's statement and photographed the car mirror, which had been dislodged from its housing.

{¶7} The next day, Alexander's supervisor, Lieutenant William Neath, and Commander Robert Sims ("Sims") of the Clinic's internal affairs department, met with Alexander to discuss Hubach's complaint. Alexander provided a written statement. Sims informed Alexander that he was being suspended for three days.

{¶8} Sims began to investigate the complaint and interviewed several department police officers and reviewed videotaped footage of the incident, pertinent reports and statements, and Alexander's work history. Sims discovered that in August 2008, Alexander had been ordered to attend counseling after he yelled at a bus driver. According to the report of that incident, Alexander was directing traffic when a Clinic bus, making a turn, grazed Alexander's right leg, knocking him forward. Alexander yelled at

the bus driver to "learn how to f****** drive." The bus driver complained about Alexander, who was not injured in the incident. At that time, the Clinic cited Alexander for two violations of Clinic policy.

{¶9} As a result of the investigation into the incident with Hubach, Sims concluded that Alexander had committed the following Clinic policy infractions:

"Policy 21-II-W Improper or negligent acts that cause damage to equipment, or property of Cleveland Clinic, employees, patients or visitors;

"Policy 121-II-X Failure to conform to professional ethics;

"Policy 121-II-EE Serious failure of good behavior;

"Standard of Conduct #3 - Cooperative Behavior and Interpersonal Relations;

"Standard of Conduct #6 - Know and Obey Laws and Organizational Directives;

"Standard of Conduct #8 - Code of Ethics and Behavior."

{¶10} Sims recommended that Alexander receive a mandatory referral to the Clinic's Employee Assistance Program ("EAP"), with an evaluation for anger management. He then referred the matter to the chief of police, John Kalavsky ("Kalavsky"), and the Clinic's human resources department.

{¶11} Sims and Kalavsky subsequently met with the Clinic's vice-president of human resources, Julie Judge ("Judge"). Judge suggested Sims and Kalavsky meet with Alexander to "ascertain if he had given some thought to his conduct and behavior, and if he had any thoughts about whether he would have done things differently" in trying to stop Hubach's car from entering the intersection. Kalavsky testified at deposition that he planned to "afford [Alexander] an opportunity that if he had made clear that there were

other options, and that his behavior was inappropriate, that he may have been given consideration for suspension." The three also discussed a referral to the EAP for anger management counseling as alternatives to terminating Alexander's employment.

{¶12} On September 23, Alexander met with Kalavsky. During the meeting, Alexander maintained his actions on September 9 were justified. Alexander explained that he had merely been trying to get Hubach to obey his commands and was concerned about pedestrian safety in making the split-second decision to try and stop her car.

{¶13} Kalavsky inquired whether Alexander would conduct himself in the same manner if a similar situation should happen again. Alexander replied that he would act differently in the future because his actions had gotten him suspended, but continued to maintain he had done nothing wrong. Kalavsky testified at deposition that he told Alexander that the CCPD must perform their duties in a manner different from traditional police due to the Clinic being a "hospital policing environment." He also informed Alexander that the situation warranted termination but asked him to go home and think further about his actions with the hopes that Alexander would be willing to take some responsibility for his conduct.

{¶14} Kalavsky asked Alexander whether he was tape-recording the conversation, to which Alexander replied "no." The chief told Alexander that he did not have the authority or the chief's authorization to tape the conversation.[1]

---

[1] After Alexander filed suit against the Clinic, the Clinic learned that Alexander had tape-recorded meetings with his superiors.

**{¶15}** Two days later, on September 25, Alexander again met with the chief and Sims. Alexander repeated that he had done nothing wrong in the Hubach incident. Alexander was then terminated from the CCPD. Kalavsky concluded that Alexander's position as a police officer should be terminated in light of multiple violations of Clinic policy and departmental standards of conduct. Kalavsky informed Alexander he could appeal his termination within the Clinic's established grievance system.

**{¶16}** Alexander did not appeal his termination with the Clinic, but subsequently filed suit against the Clinic for wrongful termination. The Clinic moved for summary judgment, which the trial court granted, finding that no genuine issue of material fact remained for trial.

**{¶17}** Alexander appealed, raising the following assignments of error for our review:

> I. The trial court committed prejudicial and reversible error by admitting unreliable and unqualified defense expert witness testimony into the record for consideration as evidence in support of the defendant-appellee's motion for summary judgment.

> II. The trial court committed prejudicial and reversible error when it granted the defendant's motion for summary judgment given there is a genuine factual dispute in the record and the defendant-appellee is not entitled to judgment as a matter of law.

**{¶18}** We discuss only the second assignment of error, as it is dispositive of this appeal.

## Summary Judgment

**{¶19}** An appellate court reviews a trial court's decision on a motion for summary

judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 1996-Ohio-336, 671 N.E.2d 241. Summary judgment is appropriate when, construing the evidence most strongly in favor of the nonmoving party, (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 1998-Ohio-389, 696 N.E.2d 201, citing *Horton v. Harwick Chem. Corp.*, 73 Ohio St.3d 679, 1995-Ohio-286, 653 N.E.2d 1196, paragraph three of the syllabus. The evidence must be viewed in the light most favorable to the nonmoving party. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978).

At-Will Employment in Ohio

{¶20} In Ohio, absent an employment contract, an employee is at will and may be terminated at anytime for any lawful reason or for no reason at all. *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 102, 483 N.E.2d 150 (1985), at fn. 1, citing *Henkel v. Edn. Research Council*, 45 Ohio St.2d 249, 255, 344 N.E.2d 118 (1976). However, an at-will employee may not be discharged or disciplined for reasons violative of a statute or public policy. *Greeley v. Miami Valley Maintenance Contrs.*, 49 Ohio St.3d 228, 551 N.E.2d 981 (1990), paragraph two of the syllabus.

{¶21} In *Greeley*, the Ohio Supreme Court recognized a public policy exception to the employment-at-will doctrine where an employee is discharged for a reason prohibited by statute. *Id.*, at paragraph one of the syllabus. In *Tulloh v. Goodyear Atomic Corp.,*

62 Ohio St.3d 541, 546, 584 N.E.2d 729 (1992), the Court expressly stated that absent statutory authority, there is no common law basis in tort for a wrongful discharge claim. But in *Painter v. Graley*, 70 Ohio St.3d 377, 639 N.E.2d 51 (1994), the Court overruled *Tulloh* and held

> '[c]lear public policy' sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the General Assembly in the form of statutory enactments, but may also be discerned as a matter of law based on other sources, such as the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law.

*Id*. at paragraph three of the syllabus.

{¶22} In his lawsuit, Alexander alleged that the Clinic wrongfully discharged him in violation of public policy.   To establish his claim, Alexander must show:   1) That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); 2) That his dismissal jeopardized the public policy (the jeopardy element); 3) His dismissal was motivated by conduct related to the public policy (the causation element); and 4) The Clinic lacked overriding legitimate business justification for the dismissal (the overriding justification element).   *Collins v. Rizkana*, 73 Ohio St.3d 65, 1995-Ohio-135, 652 N.E.2d 653, citing H. Perritt, *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U.Cin.L.Rev. 397, 398-399 (1989).

{¶23} The clarity and the jeopardy elements are questions of law and policy to be determined by the court.   *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 151, 1997-Ohio-219, 677 N.E.2d 308, citing *Collins* at 70.   The causation and

overriding-justification elements are questions of fact to be determined by the trier of fact.

*Id.*

*Dohme v. Eurand*

**{¶24}** In *Dohme*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, the Ohio Supreme Court held:

> To satisfy the clarity element of a claim of wrongful discharge in violation of
> public policy, a terminated employee must articulate a clear public policy by
> citation of specific provisions in the federal or state constitution, federal or
> state statutes, administrative rules and regulations, or common law. *Id*. at
> the syllabus.

**{¶25}** In *Dohme*, the plaintiff was fired from his employment with Eurand. He argued that he was terminated because he communicated his workplace safety concerns to an insurance adjuster who was conducting an on-site evaluation of Eurand's facility and such termination was in violation of public policy. The Court noted that once Eurand asserted that Dohme failed to identify a public policy applicable to the incident, the burden shifted to Dohme to articulate, by citation, a specific clear public policy that had been violated. To satisfy his burden as the plaintiff, Dohme relied on two Ohio Supreme Court cases that dealt with Ohio's public policy favoring workplace safety. The Court found that his citation to the cases was insufficient to meet the burden of articulating a clear public policy of workplace safety, and that such citation only generally identified a legal

basis for a statewide policy for workplace health and safety. Dohme, the Court concluded, failed to "cite any specific statement of law in support of his claim of public policy that was drawn from the federal or state constitution, federal or state statutes, administrative rules and regulations, or common law." *Id.* at ¶ 21.

{¶26} The *Dohme* Court held that it is the plaintiff that must assert a public policy and identify federal or state constitutional provisions, statutes, regulations or common law that support the policy; the court may not presume to sua sponte identify the source of that policy. *Id.* at ¶ 23.

> As the plaintiff, Dohme has the obligation to specify the sources of law that support the public policy he relies upon in his claim. Because Dohme did not back up his assertion of a public policy of workplace safety in his summary-judgment documents with specific sources of law, he has not articulated the clarity element of specificity.

*Id.* at ¶ 22. Consequently, it is the terminated employee that must cite the specific provision that was violated, a reviewing court may not sua sponte identify the source of that policy. *Id.*

{¶27} Although *Dohme* did not change the law in Ohio, it reinforced the Court's view that it is incumbent upon the plaintiff to *clearly* identify the federal or state constitution, federal or state statutes, administrative rules and regulations, or case language upon which he or she is relying. Therefore, in this case, it was incumbent upon Alexander to articulate the specific state statute, rule, or law that he was relying on in claiming that his discharge violated public policy; this court cannot provide it for him.

{¶28} With this in mind, we now turn to Alexander's second assignment of error, in

which he argues that the trial court erred in granting summary judgment to the Clinic.

Clarity

{¶29} As mentioned above, it is the clarity element that is most at issue in this case. Alexander claimed that public policy dictates that police officers enforce the laws of the state of Ohio; thus, discharging a police officer for enforcing the laws "would jeopardize the public policy of wanting police officers to enforce Ohio laws."

{¶30} In his supplemental brief to this court following remand, Alexander cites to R.C. 1702.80(D), R.C. 2935.03, and common law, "where cases have made it clear, that as a matter of public policy police officers may not be fired for enforcing the law." The cases Alexander cites to in support of his common law argument are *Barnes v. Cadiz*, 7th Dist. No. 01531CA, 2002-Ohio-1534, ¶15 and *State v. Boymin*, 106 Ohio App. 393, 154 N.E.2d 823 (9th Dist.1958).

{¶31} What this court must consider, pursuant to *Dohme*, is whether the Clinic asserted, in its motion for summary judgment, that Alexander had not met the clarity element and, if so, if Alexander met his reciprocal burden by supporting his claims with specific citations in his materials opposing summary judgment.

{¶32} In its motion for summary judgment, the Clinic alleged that Alexander could not identify any public policy that was violated by his firing. In his motion opposing summary judgment, Alexander responded that courts in Ohio have "held on numerous occasions * * * that an employer who dismisses an employee because he or she refused to violate the law, acquiesce in illegal activity, or violate an oath of office as a condition of

employment violates the public policy of Ohio." p. 3 of Brief in Opposition to Clinic's Motion for Summary Judgment.

{¶33} Again, the specific public policy that was violated, Alexander argued, was the public policy that police officers must uphold or enforce the laws of the state of Ohio. Based on *Dohme*, we must consider whether Alexander *clearly* supported his public policy argument with a "specific statement of law * * * that was drawn from the federal or state constitution, federal or state statutes, administrative rules and regulations, or common law." *Dohme* at 173.[2]

{¶34} In his motion in opposition to the Clinic's motion for summary judgment, Alexander cited R.C. 1702.80(D) in support of his public policy argument. The statute governs qualified nonprofit corporation police departments such as the CCPD and provides that if a qualified nonprofit corporation establishes a police department, the department "shall preserve the peace, protect persons and property, enforce the laws of the state" and "each police officer * * * is vested with the same powers and authority as are vested in a police officer of a municipal corporation." R.C. 1702.80(D).

{¶35} The Clinic argues that R.C. 1702.80(D) is not sufficient to support Alexander's public policy argument because there is no statutory embodiment of an employer's responsibilities or an employee's rights. To support this proposition, the Clinic notes authority cited to in *Dohme*: *Pytlinski v. Brocar Prods., Inc.*, 94 Ohio St.3d

---

[2]We note that in *Alexander I*, both the majority and the dissent agreed that Ohio public policy dictates that a police officer uphold the law.

77, 760 N.E.2d 385 (2002); *Kulch*, 78 Ohio St.3d 134, 152, 677 N.E.2d 308; and *Sutton v. Tomco Machining, Inc.*, 129 Ohio St.3d 153, 2011-Ohio-2723, 950 N.E.2d 938, ¶ 11.   In these cases the plaintiffs had cited specific employment-related statutes (OSHA statues in *Pytlinski* and *Kulch* and worker's compensation statutes in *Sutton*) in support of their public policy arguments.

**{¶36}** We find, however, no requirement that a supporting statute be employment-related or otherwise set forth an employer's responsibilities and/or an employee's rights.   For illustration purposes, in *Collins*, 73 Ohio St.3d 65, 72, 652 N.E.2d 653, the Ohio Supreme Court found that Ohio's criminal sex offense statutes embodied sufficiently clear expressions of public policy to justify a public policy exception in cases of sexual harassment and discrimination.

**{¶37}** Unlike *Dohme*, in which the Court found that the plaintiff failed to "cite any specific statement of law in support of his claim of public policy that was drawn from the federal or state constitution, federal or state statutes, administrative rules and regulations, or common law," here, Alexander cited to "a specific statement of law" that was drawn from R.C. 1702.80(D).

**{¶38}** Therefore, we find that the clarity element has been met so as to withstand a motion for summary judgment.

### Jeopardy

**{¶39}** We next consider the jeopardy element, that is whether dismissing employees under circumstances like those involved in the Alexander's dismissal would jeopardize the

public policy of wanting nonprofit corporation's police officers to enforce the law. In other words, having found clear public policy sufficient to justify an exception to the employment-at-will doctrine, we must now determine whether dismissals for enforcing the law would jeopardize the public policy.

{¶40} The Clinic has argued throughout that its police force is a non-traditional policing environment in a hospital setting. Thus, its police officers must somehow behave differently and "balance between being a municipal law enforcement agency * * * with being customer service professionals" because they are dealing with a "highly stressed populace." Kalavsky deposition, p. 35.

{¶41} But R.C. 1702.80(D) does not provide for this distinction between nonprofit corporation police officers and public police officers. Nor can the Clinic cite any authority which does. R.C. 1702.80(D) clearly states that a nonprofit corporation's police officer "is vested, while directly in the discharge of that police officer's duties as a police officer, with the same powers and authority as are vested in a police officer of a municipal corporation" and is charged with "preserving the peace, protecting persons and property, enforcing the laws of the state, and enforcing the charter provisions, ordinances, and regulations of the political subdivisions of the state." *Id.*

{¶42} Clearly, public policy in this state would be seriously compromised (jeopardized) if employers were allowed to fire its police officers for upholding or enforcing the law, no matter if the police force is in a municipal/county/state or non-traditional setting. Obviously, such retaliatory practices could deter or confuse even

"non-traditional" police officers from performing their statutory functions.

{¶43} Here, Alexander is steadfast in his assertion that he attempted to stop Hubach, who had ignored his command. He claims to have done so based upon a good faith belief that he was enforcing the law and attempting to protect himself and pedestrians in the immediate area. According to Alexander, he was discharged solely for his actions in trying to get Hubach to stop and for refusing to admit he had acted "outside the law." Under these circumstances, we find that the jeopardy element of the tort of wrongful discharge has clearly been satisfied.[3] *See generally Kulch*, 78 Ohio St.3d 134, 154, 677 N.E.2d 308. Again, as discussed below, whether Alexander was enforcing the law when he approached Hubach is a question of fact for the jury, not a question of law for this court to decide at the summary judgment stage.

Causation and Overriding Justification

{¶44} Although the Clinic argues that Alexander was not enforcing any law when he hit Hubach's mirror and even though striking a car's mirror may not be an effective, or even safe, means by which to enforce traffic laws, whether he was acting "outside" the law, breaking the law, or as the Clinic argues "crossing the line" when he made a split-second decision to try and get Hubach to stop is a question of fact for the jury to decide (the causation element). Whether the Clinic fired him for such actions, or for other reasons, is also a question of fact for the jury (overriding justification element).

---

[3]Moreover, because there is no statutory remedy available in R.C. 1702.80(D), we need not consider whether a statutory remedy is adequate to protect plaintiffs like Alexander. *See Collins*, 73 Ohio St.3d 65, 73, 652 N.E.2d 653.

**{¶45}** At deposition, Kalavsky testified as follows:

Counsel for Alexander: My client was in the performance of his lawful duties as a police officer during this incident with Hubach on September 9, 2002, can we agree on that?"

Kalavsky: Yes.

**{¶46}** Both Kalavsky and Judge agreed at deposition that a police officer is required to make split-second judgments about how to enforce the laws. Alexander, in his statement, wrote that Hubach was traveling between 30-35 m.p.h. approaching the intersection and, after he made eye contact with her and directed her to stop, it became apparent to him that she was not going to comply with his signal to stop. He further stated: "I made contact with the vehicle for the exclusive purpose of gaining the operator's full attention and understanding my order to stop. However, nothing worked and the vehicle proceeded through the crosswalk."

**{¶47}** Kalavsky clearly stated that Alexander was terminated solely based on the Hubach incident; he was not terminated due to his previous performance evaluations or for prior discipline stemming from swearing at a bus driver. Moreover, although Alexander's annual performance evaluations showed areas that could be improved, they were generally positive evaluations in which his overall performance was rated "fully met expectations" in April 2007 and March 2008 and "mostly met expectations" in March 2009. We also note that a month prior to his termination, the CCPD gave Alexander a certificate of recognition naming him a training officer.

**{¶48}** The Clinic also argues that the CCPD gave Alexander multiple chances to

admit his wrongdoing with regard to Hubach and that if he had acknowledged his error he may not have been terminated.   Alexander, however, remains steadfast in his position that he acted appropriately.   Again, whether Alexander reacted wrongly towards Hubach when she, he claims, ignored a clear police command is a matter of fact that is better suited for a jury to decide.

{¶49} In addition, although the Clinic's expert opined that Alexander was not upholding any Ohio law during the incident, a reasonable jury could disagree.   Again it is a question of fact whether Alexander's dismissal was motivated by conduct related to public policy and whether the Clinic lacked an overriding legitimate business justification for his termination.   Even though Alexander has the reciprocal burden to demonstrate causation and the lack of an overriding justification once the Clinic shows otherwise, we find that Alexander has been able to meet his burden to overcome summary judgment in this case.

{¶50} Therefore, we find that Alexander submitted evidence sufficient to meet the clarity and jeopardy elements of the public policy exception to the employment at-will doctrine and has further demonstrated triable questions of fact on the causation and overriding justification elements.   The trial court erred when it granted summary judgment in favor of the Clinic.

{¶51} The second assignment of error is sustained.   Based on the disposition of the second assignment of error, the first assignment of error is moot.   *See* App.R. 12(A)(1)(C).

**{¶52}** Accordingly, judgment is reversed and the case remanded for proceedings consistent with this opinion.

It is ordered that appellant recover of appellee his costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., JUDGE

PATRICIA A. BLACKMON, A.J., CONCURS;
MARY J. BOYLE, J., DISSENTS WITH
SEPARATE OPINION


MARY J. BOYLE, J., DISSENTING:

**{¶53}** I respectfully dissent from the majority's opinion. I disagree that Alexander has met the standard set forth in *Dohme v. Eurand Am., Inc.*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, to support the clarity element. I do not agree that R.C. 1702.80(D) provides a clear public policy in contravention of the Clinic's decision to terminate Alexander's at-will employment for striking a moving vehicle while working a traffic detail. Nor can I accept Alexander's general characterization that he was discharged for enforcing the laws in his capacity as a police officer.

{¶54} The record is clear that the Clinic did not discharge Alexander for enforcing the law. To the contrary, the investigation leading to Alexander's termination arose because of Alexander's misconduct, wherein he improperly struck Hubach's car mirror. As recognized by the majority, his conduct violated six distinct Clinic policies. In my opinion, six policy infractions clearly support the Clinic's position that Alexander "crossed the line" during the performance of his duties and that such action does not fall within the realm of "enforcing the law." Therefore, because I find that R.C. 1702.80(D) does not evidence a public policy that prevents an employer from discharging an employee for ignoring employer policies in the performance of his or her duties, I would affirm the trial court's grant of summary judgment in favor of the Clinic.