[Cite as *Nance v. Lima Auto Mall, Inc.*, 2020-Ohio-3419.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

ANGELINA NANCE,

    PLAINTIFF-APPELLANT,

    v.

LIMA AUTO MALL, INC., ET. AL,

    DEFENDANTS-APPELLEES.

CASE NO. 1-19-54

O P I N I O N

Appeal from Allen County Common Pleas Court
Trial Court No. CV2018 0324

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision:  June 22, 2020**

APPEARANCES:

    *Matthew G. Bruce* **for Appellant**

    *J. Alan Smith* **for Appellees**

**WILLAMOWSKI, J.**

{¶1} Plaintiff-appellant Angelina M. Nance ("Angelina") appeals the judgment of the Allen County Court of Common Pleas, alleging the trial court erred in granting the defendants-appellees' motion for summary judgment. For the reasons set forth below, the judgment of the trial court is affirmed in part and reversed in part.

*Facts and Procedural History*

{¶2} Angelina's father, Henry Nance ("Henry"), worked as the manager of the Detail Department at Lima Auto Mall, Inc. ("Lima Auto Mall"). Henry Deposition, 7, 23. In 2015, a male detailer who worked for Henry at Lima Auto Mall was terminated for insubordination. McClain Deposition, 15. Henry Deposition, 25. Henry spoke to Rodger McClain ("McClain"), who was the vice president and general manager at Lima Auto Mall, about hiring Angelina to fill this vacant detailing position. McClain Deposition, 19, 23-24. Henry stated that Angelina had previous experience at detailing vehicles and was a "really good worker * * *." Henry Deposition, 22, 25.

{¶3} Henry then offered Angelina a job as a detailer at the Lima Auto Mall. Angelina Deposition, 26, 46. Angelina accepted this offer and was hired without having been interviewed. *Id*. at 46. She began working a full-time job as a detailer at Lima Auto Mall on May 8, 2015. *Id*. at 30, 57, 64. While Lima Auto Mall has employed a number of women, Angelina was the only woman to have applied for a

job in their detail department and was the first woman to work in the detail department. Doc. 29, Ex. A. McClain Deposition, 34, 37.

{¶4} At the time that she was hired, there were around six employees under Henry's supervision in the detail department. McClain Deposition, 14. Henry Deposition, 27. Of these six employees, there were three detailers, including Angelina. Angelina Deposition, 55, 61. Henry Deposition, 27. For the duration of her employment at Lima Auto Mall, Henry was Angelina's direct supervisor. Angelina Deposition, 64. Henry Deposition, 24.

{¶5} In his deposition, Henry stated that Angelina was "a hard worker" and a "good detailer." Henry Deposition, 9, 21. He also said that "she loved to run her mouth" and indicated that she "disrespected" him at work. *Id*. at 9, 20, 38. He testified that Angelina "would try to tell [him] how to do [his] job" and affirmed that she would "sometimes" intimidate him. *Id*. at 10, 19. He further stated that Angelina would, in front of the other employees, engage in "face to face" arguments with him and would tell him that he did not know what he was doing. *Id*. at 38.

{¶6} He stated that "[s]he would get on her phone and look up stuff and tell them, no, this is how you do it." Henry Deposition, 38-39. He stated that he would get complaints from other employees of Lima Auto Mall about Angelina's various comments, saying:

> **I have had complaints from other people, from salesmen, you know. And I was told many a time, if she wasn't your daughter, I would tell her off real good, but I'm coming to you. And I says,**

> **I'll handle it. And I would handle it. But it would be okay for a while and then back again. I just—just—just drove me nuts.**

*Id*. at 14. He stated that he told Angelina, "[y]ou got to give respect to get respect. And I says, * * * you got to learn, this is your job. * * * [Y]ou can't go ahead and just say, hey I'm not going to do it because my dad's the boss. * * * You do your job." *Id*. at 16.

{¶7} Henry said that Angelina also spoke about politics and sports in the detail shop. Henry Deposition, 10, 38. He testified that her political comments "would upset some of the other guys" and that "she would go * * * on and on and on." *Id*. at 11. He said this "was making [him] so upset because these people are here to work, not to listen to politics." *Id*. Angelina was a "Green Bay Packer fan" and that "[e]verybody else was worthless." *Id*. at 12. Henry reported that

> **she would get some of these guys stirred up and, you know, there's a lot of guys there that, you know, they have their own favorite teams, and she would go ahead and get them to where they were screaming. I would have to come out—and sometimes I wished I had a whistle to blow, to cut it, but I didn't. I'd have to come out, stop my work completely, to tell her to go back to work; you guys go back to work. That's the problem that I've had.**

*Id*. at 13. On two occasions, he had to tell her that she could either "go back to work or punch out and go home, cool off, then * * * come back." *Id*.

{¶8} Henry stated that Angelina also talked about her family a great deal. Henry Deposition, 34. He said,

> **Angie would go ahead and say, you know, my wife's the best shopper, my wife is the best at this, my wife is the best at that. I**

> **said, Angie, we—we don't care, you know, we have wives and girlfriends, too. I mean, you're making us look like we have nothing at home. I says, if you would, you can go ahead and say that she's good at this, good at that, but I said, don't every day, every day.**
>
> **It didn't have nothing to do with being gay or anything. It just happened to be bragging too much.**

*Id*. at 34. McClain had told Henry to tell Angelina to stop talking so much about her wife, Vanessa Nance ("Vanessa"). *Id*. at 35.

{¶9} Henry stated that the other employees in the detail shop did not talk about Angelina's sexuality. *Id*. at 37. He did testify that Angelina would bring up her lifestyle and would tell the others that they "don't know what it's like to be gay." *Id*. at 13. Henry further said that McClain was aware that Angelina was gay when she was hired and that McClain had never made any comments about Angelina's sexual orientation. *Id*. at 33.

{¶10} In his deposition, McClain stated that he was aware that Angelina was gay at the time she was hired and indicated that he was not aware of Angelina "pushing her sexuality on anyone" at work. McClain Deposition, 16, 38. He also said,

> **When she and her other half got married, she tended to want to talk more about the relationship, and everybody was complaining. You know, they get tired of hearing about it. And her son, this and that and the other. And I said something to Henry, to tell her to cool her jets about her personal life. And he did. And she got very, very on the defensive on that, towards me.**

*Id*. at 16. McClain also said that he never talked to Angelina about her lifestyle but did say that Angelina's comments about her wife and son did make him feel uncomfortable. *Id*. at 44, 45.

{¶11} McClain said that "rather than being an employee, she created her dad some headaches." McClain Deposition, 10. He said that other employees would complain to him about how Angelina "treated them" and the way that she talked to Henry. *Id*. at 10-11. McClain said he would approach Henry about these issues, saying "Henry, you got to do something about this * * *. He'd say I'll talk to her." *Id*. at 10. One of the other detailers told McClain that Angelina was "was always showing him how to do" his job. *Id*. at 12. Angelina told McClain that "[s]he was trying to help [her coworker] * * *." *Id*.

{¶12} McClain further testified that he "heard a lot about politics, back there" and that Angelina would "even come after [him] on politics." McClain Deposition, 15. He said,

> **Just * * * it got to be on everybody's nerve, listening to her yab-jab. She talked too much. She's got a mouth. And don't disagree with her, because the argument is on. And she won't let loose. And if you corner her, she'll get really hatey. She can get really nasty.**

*Id*. at 43. He further said that Angelina was "stirring the pot" in the detail shop and described a confrontation between her and Henry at work. *Id*. at 47.

{¶13} In her deposition, Angelina stated that, in the detail department, they "all argued" and that they argued "every day." Angelina Deposition, 73, 203. She

testified that, more than arguing, they "bantered every day. It was like, hey, did you see this team? Hey, they sucked * * *." *Id*. at 203. She also said that everyone talked about politics in the shop and that she did not impose her views on any of her coworkers any more than they imposed their views on her. *Id*. She stated that she argued with her father about "petty stuff" but that she did not argue with him about the "actual job." *Id*. at 73. She also said that she "always" argued with another one of her coworkers in the detail shop about sports and politics. *Id*. at 74.

{¶14} When asked about how those she worked with addressed her lifestyle, Angelina stated that Henry once, in 2017, expressed displeasure over the fact that someone else was gay. Angelina Deposition, 76. However, Angelina said that Henry "embraced" and "accepted" the fact that she was gay. *Id*. 76-77. She said that Henry had told her to stop referring to Vanessa as her wife around McClain because this made McClain and others at work feel uncomfortable. *Id*. at 80. In response to this request, Angelina stopped referring to Vanessa as her wife. *Id*. at 83-84. She agreed that, aside from this "isolated incident," there was "no other expression of dislike or displeasure" with her lifestyle at Lima Auto Mall. *Id*. at 80. Angelina indicated that she did not talk "a lot" about her lifestyle with her coworkers and that she did not impose her views about her lifestyle on others. *Id*. at 204.

{¶15} When asked whether she was treated differently on the basis of her gender, Angelina replied by saying, "I believe the way that I received my raises and I just feel like I was treated differently than my male counterparts." Angelina

Deposition, 197. She believed that she was, in this way, discriminated against because she was female but also said that she did not know whether she was discriminated against, in this matter, because she was gay. *Id*. at 198. McClain affirmed that "[i]t was unusual for employees to request a raise because [he] usually evaluate[d] wages once a year and not at the request of employees." Doc. 29, Ex. A. He further stated that, in response to her request, he did give her a raise. Doc. 29, Ex. A.

{¶16} Angelina further stated that she believed the way that overtime was divided was discriminatory. Angelina Deposition, 200. She indicated that historically one detailer would receive all of the overtime. *Id*. at 199. Angelina said that, at one point, she worked out a system with another detailer in which they split the overtime. *Id*. at 200. However, after a new detailer was hired, Angelina's employer allowed this new employee to have one third of the overtime. *Id*. When Angelina asked McClain why this employee had a share of the overtime, McClain replied that the new employee had "a family too." *Id*. at 200. Angelina stated that it was "like mine [her family] is less important." *Id*.

{¶17} McClain stated that there were three detailers and that the overtime was evenly split between these three employees. Doc. 29, Ex. A. Further, Henry testified that he made an overtime schedule for the detailers but that Angelina decided to make her own schedule for the others to follow. Henry Deposition, 58. He said that Angelina

> **marked off, what days she wanted to work.  And it was kind of unfair, but I let her do it, because, you know, she needed the extra money.  Well, she made up her own and she started to—she went ahead and told Dennis she wanted him to work all the Saturdays, she would work the Mondays and Thursdays.  Well, that's not exactly fair, you know.**

*Id*. at 59.  Henry stated that the three detailers argued about the overtime schedule but eventually agreed on the overtime split.  *Id*.

{¶18} On December 13, 2017, Angelina reported to her father that she had been injured while working that morning.  Angelina Deposition, 88, 149.  She stated that her vacuum got stuck under the seat of a car.  *Id*. at 109.  As she was trying to pull the vacuum free, she "felt * * * a popping in [her] shoulder, and then * * * had a sharp pain that went down into [her] shoulder blade."  *Id*. at 109.  No one witnessed Angelina get injured at work.  *Id*. at 110.  Angelina stated that Henry told her not to file a workers' compensation claim.  *Id*. at 152.

{¶19} However, Henry stated that neither he nor McClain told Angelina not to file a workers' compensation claim.  Henry Deposition, 62.  In an affidavit, Henry stated the following:

> **I never told Angie not to file a workers' compensation claim.  I told her if she wanted to file a workers' compensation claim, then file it.  If she wanted to go to the hospital and have her medical bills taken care of, then the company would pay them for her and she didn't have to file a workers' compensation claim.  That's the choice that everyone at Lima Auto Mall can make—the company will pay your bills, but if you want to file a workers' compensation claim then you can file it.  Other employees at Lima Auto Mall have filed workers' compensation claims.  For example, Jeff**

**McDaniel filed a workers' compensation claim for a back injury.
He still works at Lima Auto Mall.**

Doc. 29, Ex. B. McClain, in his deposition, stated that he told Henry to tell Angelina "we'll pay to have it looked at; you know, don't file workman's comp, I'll pay to have it taken care of." McClain Deposition, 59.

{¶20} After she informed her father of her injury, Vanessa picked Angelina up from work and took her to get medical attention. *Id*. at 149. She first went to Urgent Care where she reported that she injured her shoulder while reaching for something in a cabinet at her home. *Id*. at 150. Ex. F. When asked why she said her injury occurred at home, Angelina stated that she was told by Henry not to report a workplace injury and that, for this reason, she lied. *Id*. The doctor at Urgent Care issued her a work excuse that stated the following restriction: "No work 12/13-12/14/17 due to injury." Ex. M. *See* Ex. F.

{¶21} Angelina then went to see Dr. Ana Pere ("Dr. Pere"), who was her family doctor. Ex. H. Angelina Deposition, 194. Angelina also told Dr. Pere that she injured her arm while reaching for something above her head. Ex. H. Angelina Deposition, 177, 181. She further reported that she had been experiencing "shoulder pain off and on for the last several months." Ex. H. Dr. Pere gave Angelina a note that stated she could return to work on December 18, 2017. Ex. M.

{¶22} On December 14, 2017, Angelina went to the Orthopaedic Institute of Ohio ("OIO"). Ex. G. Dr. Mark McDonald ("Dr. McDonald") provided her with a

work slip that stated Angelina could "work with [her] left hand only. [N]o right hand buffing or lifting until f[ollow] up with us." Ex. M. Her follow up appointment was to occur two weeks after her initial appointment at OIO. Ex. G. She stated that she "actually had to con the doctor into letting me do light duty because I told him my dad was my manager and that he would make sure I didn't do anything * * * to irritate my shoulder." Angelina Deposition, 142.

{¶23} Angelina then brought these doctor's notes to McClain at Lima Auto Mall. Angelina Deposition, 195. She stated the following about this interaction:

> **I gave Rodger the paper; and he kind of snickered and said, I wouldn't hire a one-armed man, let alone a one-armed woman. What am I supposed to do with someone with one arm?**
>
> **And I said, so what you're saying is—and he said, you need to just get completely taken off, I don't have anything for you to do.**

*Id*. at 142. She also stated that McClain told her "to go ahead and get taken off work." *Id*. at 195.

{¶24} When asked whether he said he "would never hire a one-armed man, let alone a one-armed woman," McClain said,

> **Yeah, I probably said—as a joke. I mean, sitting there laughing, say, Angie, I wouldn't hire a one-armed man to buff a car, I can't. That's just a slang comment. I mean, I didn't have any meanness to it, in any way. But, I mean, more of a job, if I said it.**

McClain Deposition, 67. In his affidavit, McClain admitted the following: "I made a joke while laughing that I wouldn't hire a one-armed person, which I did not intend to be mean, but as a joke." Doc. 29, Ex. A. He further stated that he "did not have

any light duty available for her" at the time that she brought in her doctor's note. Doc. 29, Ex. A.

**{¶25}** McClain stated that, after his conversation with Angelina—"might have been the next day," Henry came to him and talked about what Angelina could do in the detail department. McClain Deposition, 66. McClain told Henry that Angelina could work as a cleaner but that he "was not paying her what [he was] paying her to buff cars." *Id.* McClain stated that Henry offered Angelina this light duty position but that Angelina refused this offer. *Id.* at 62, 64, 68. He stated that, when Henry made this offer to Angelina, some of the other employees left the detail shop, came to McClain, and informed him that Angelina was "on her dad like you wouldn't believe." *Id.* at 68-69.

**{¶26}** Henry testified that he spoke with McClain, who approved of allowing Angelina to work as a cleaner instead of as a detailer. Henry Deposition, 45. At some point, Henry called Angelina on the phone while he was at home to discuss whether she would consider light duty. *Id.* at 41, 47. He testified about the ensuing conversation with her as follows:

> **I says, I'm not bringing you back on detailing. I can't—I don't want to injure your shoulder. And I says, you know—and that's the way I feel.**
>
> **I can give you some light duty, to where you can still make some money. Well—and I did this on the phone. Okay. And she ripped me from one end to the other. And my wife is sitting there and she says, what is going on? And she could hear her. And I said, I offered her to come back light duty, not detailing, because of her**

> **shoulder, her injury; she told me, she wasn't coming back. She said, I'm not coming back, I'm taking my time off, and that's the way it is.**
>
> **I said, Angie, so you're refusing a position that's not going to bother your shoulder or nothing, to where you can earn some money? Because she complained that she wasn't getting no money, because, you know, she was at home, she wasn't working.**
>
> **And I told her, you know, if you're going to refuse me, then, you know, that's up to you. But we got into it. We didn't talk for a while. And then all the sudden, she just pops up and wants to come back to work. And we don't run a business like that * * *.**

Henry Deposition, 41-42. He also stated that she would have gotten the same amount of pay working as a cleaner. *Id*. at 45-46.

{¶27} Angelina testified that Henry called to tell her that they were able to find some light duty work for her to do. Angelina Deposition, 135. She stated that she was "happy to come back" and was "willing to do whatever * * *." *Id*. at 136. She told Henry that she had been in the process of working with OIO to get the proper paperwork submitted for her short-term disability since McClain had previously told her that she should be off from work. *Id*. at 98-99, 136. She also said that the personnel manager at Lima Auto Mall wanted a medical release from her doctor before she could work. *Id*. at 98. Angelina stated that she tried to explain this to Henry but that he was not listening. *Id*. at 98-99, 136.

{¶28} Angelina stated that she hung up on Henry and that he then left her an angry voicemail in which he stated the following: "If either one of you ever f*** with me again and say s*** you did, I will f***ing beat you're a**es. You got that?

You f***ing dumb a**es." Angelina Deposition, 135. When asked whether it was appropriate to threaten an employee, Henry replied by saying, "No." Henry Deposition, 48. When asked whether it was appropriate to threaten his daughter, Henry stated that "if you know what she said to me, yes. Yes." *Id.* He also said, "You didn't hear what's on this side, why I threatened. You guys only heard that side, of me yelling." *Id.* at 46.

{¶29} On December 19, 2017, Henry filled out an employee warning notice for Angelina because she did not return to work on December 18, 2017. Ex. L. The document stated that Angelina was "called * * * to come back for light duty work" but noted that she did not return. Ex. L. The report further stated that Angelina had wanted to work in the office but that no work was available for her there. Ex. L. Henry testified that he showed this document to Angelina and that she had refused to sign this notice. Henry Deposition, 40-41. Angelina testified that she never saw this employee warning notice. Angelina Deposition, 192.

{¶30} On December 29, 2017, Angelina returned to OIO for her follow up appointment. Ex. G. Her medical records indicate that she should be "off another two weeks and then she [would be] able to return to work full duty, no restrictions at that time." Ex. G. On the date of her follow up appointment, OIO issued a work slip that stated Angelina should be "off work until 1.15.18, return to work full duty no restrictions." Ex. 1. When shown a copy of this work slip, Henry stated that he was not aware of this document and did not know when Angelina was going to

-14-

return to work. Henry Deposition, 53. McClain testified he remembered seeing this work slip before his deposition but could not recall when he first saw this document. McClain Deposition, 64.

{¶31} McClain testified that Angelina filed for short term disability and that Lima Auto Mall's insurer paid her short term disability benefits. McClain Deposition, 60. He then stated that Angelina

> **was told to come back to work—they told her to come back. She decided not to come back, she decided to take two more weeks of therapy. And even our insurance company called and said, is she back to work today? Because they were paying her disability. And I was there when [the personnel manager] said, they just called and I told them, no, she didn't show up.**
>
> **She's off of disability, but she didn't come back. And upon herself, decided to take two more weeks of therapy.**
>
> **In the meantime, Henry and I talked about how's it going in back, there, without her. He says, it's been very peaceful, it's been very good and we're getting along fine. I said, fine, I need to cut. When she comes back, I'm going to lay her off; you can't do it, I'm going to handle it.**

*Id*. at 61.

{¶32} On January 15, 2018, Angelina returned to work at Lima Auto Mall. Angelina Deposition, 196. At this point, she did not have any medical restrictions as to her activities and had not worked at Lima Auto Mall since her injury on December 13, 2017. *Id*. at 130, 196. After Angelina arrived, Henry, on McClain's request, sent her to McClain's office. Henry Deposition, 66. At the meeting in McClain's office, McClain informed Angelina that her position at Lima Auto Mall

Case No. 1-19-54

was being terminated as of that date. Henry Deposition, 66. McClain Deposition, 77. Angelina Deposition, 132. Ex. 2. Only Angelina and McClain were present at this meeting in McClain's office. McClain Deposition, 77. Angelina Deposition, 129.

{¶33} In her deposition, Angelina testified that the "gist" of what McClain told her in this meeting was as follows:

> **[H]e said, unfortunately, I have to let you go. He said, at this point you're a liability to our company with that shoulder being as bad as it is. My wife had the same shoulder injury. It's probably not going to heal, and basically I'm doing you a favor. * * * [H]e said I will make sure you get unemployment.**

Angelina Deposition, 132. Angelina also said that McClain indicated that "he felt like [her] injury was really bad, his wife had experienced the same thing, and he just didn't feel like [she] was going to heal * * *." Angelina Deposition, 129.

{¶34} Regarding the meeting in which he laid off Angelina, McClain said that he did remember telling Angelina about his wife's rotator cuff surgery. McClain Deposition, 78. However, he could not recall whether he told Angelina that she was a liability to the company. *Id*. McClain stated that Angelina's injury did not have any impact on his decision to terminate her. *Id*. at 78. He also said that she was qualified for this position and good at her job. *Id*. at 24. He testified that Angelina was terminated because business had "slowed down" and because he "need[ed] to lighten up the employees back there." *Id*. at 77. To support this claim, McClain pointed to the fact that he had opted not to fill the position of another

-16-

detailer who had left the company several weeks after Angelina was terminated. *Id.* at 83.

{¶35} McClain indicated that there were somewhere in between six and eight employees in the detail department when Angelina was hired. McClain Deposition, 13-14. He then said that, by the time of the deposition, there were around three and a half positions, not counting Henry's job, in the department. *Id.* at 14. He also stated that Lima Auto Mall had been cutting positions "to make ends meet" and "tightening up the budget, so [they] can stay in business." *Id.* at 19. In 2009, Lima Auto Mall had between 120 and 130 employees. *Id.* This number had been reduced to in between roughly sixty and sixty-five employees. *Id.* at 18. He further testified that Lima Auto Mall used to have eight franchises but only had two at the time of this litigation. *Id.* at 13. Doc. 29, Ex. A.

{¶36} Lima Auto Mall stated, in its response to the Ohio Department of Job and Family Services request for separation information, that the final event that caused her discharge was that she "had been on disability from 12-13-17 and was to report back 1-15-18. When she return [sic], things had slowed down plus she had injured her shoulder and we did not want any more injuries to her." Ex. 3. When asked what this response meant, McClain said, "I didn't want her to get hurt again, doing her job. She got hurt doing the job. I didn't want her to get hurt, doing the job, again. Plus, we had slowed down, we didn't need her." McClain Deposition, 82.

{¶37} McClain was then asked about Lima Auto Mall's response to Angelina's seventh interrogatory, which inquired into the reason that she was terminated. McClain Deposition, 84. Lima Auto Mall stated, in part, that Angelina was terminated for "insubordination." *Id*. McClain stated that insubordination "was part of it." He further said, "I have explained * * * how she was to her father, her boss, and to other people back there. Over—basically, overriding her father, as a manager, she was insubordinate. And we slowed down." *Id*. at 85.

{¶38} He stated that he never formally reprimanded Angelina and would instead talk to Henry, who was her supervisor and father. McClain Deposition, 86. He stated that it was a "unique situation" as Henry was Angelina's father and supervisor. *Id*. at 87. For this reason, McClain was unsure of how Henry handled disciplinary issues with Angelina, though McClain was not aware of any formal reprimands for insubordination. *Id*. Henry testified that he never gave Angelina formal evaluations for her performance. Henry Deposition, 32. He also said that he did not formally discipline Angelina but, "[a]s a manager" would give her a "fatherly threat" that he would "send [her] home." *Id*. at 40. Henry stated that, since Angelina left, the detail shop has been "peaceful. Nobody is arguing with nobody." *Id*. at 39.

{¶39} On January 26, 2018, after she had been terminated and had met with her attorney, Angelina decided to file a workers' compensation claim. Angelina Deposition, 105. Ex. D. McClain stated that Lima Auto Mall fought Angelina's

worker's compensation claim. McClain Deposition, 72. While McClain could not remember the specific reason that the company fought this claim, he stated the following at his deposition: "I don't think she deserved workers' comp, to be honest with you. I paid the bills and she was released to come back to work with no problems." *Id*. 71-72.

{¶40} On July 13, 2018, Angelina filed a complaint with the trial court, naming Lima Auto Mall, Inc. and McClain as defendants. Doc. 1. This complaint listed the following claims: workers' compensation retaliation, wrongful termination in violation of public policy, gender or sex discrimination, wrongful termination based on gender discrimination, disability discrimination or perceived disability discrimination, wrongful termination based on disability discrimination, and intentional infliction of emotional distress. Doc. 1. The defendants filed a motion for summary judgment on May 1, 2019. Doc. 29. On June 28, 2019, Angelina filed a brief in opposition to the defendants' motion for summary judgment. Doc. 38. On August 14, 2019, the trial court granted the defendants' motion for summary judgment. Doc. 43.

{¶41} The appellant filed her notice of appeal on September 11, 2019. Doc. 45. On appeal, Angelina raises the following assignments of error:

**First Assignment of Error**

**The trial court erred when it granted summary judgment to defendants on plaintiff's claim of wrongful termination in violation of public policy.**

**Second Assignment of Error**

**The trial court erred when it granted summary judgment to defendants on plaintiff's claim of gender/sex discrimination.**
**Third Assignment of Error**

**Appellees were not entitled to summary judgment on appellant's sexual orientation discrimination claims.**

**Fourth Assignment of Error**

**The trial court erred when it granted summary judgment to defendants on plaintiff's claim of disability discrimination.**

We will first set forth the legal standard governing motions for summary judgment

before we proceed to examine each of Angelina's assignments of error.

*Legal Standard for Summary Judgment*

**{¶42}** Under the Ohio Rule of Civil Procedure 56(C), a trial court may grant

a motion for summary judgment when

> **(1) [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.**

*M.H. v. Cuyahoga Falls*, 134 Ohio St.3d 65, 68, 2012-Ohio-5336, 979 N.E.2d 1261,

¶ 12, quoting *Temple v. Wean United, Inc*., 50 Ohio St.2d 317, 327, 364 N.E.2d 267

(1977), citing Civ.R. 56(C).

> **"The party moving for summary judgment has the initial burden 'to inform the trial court of the basis for the motion, identifying**

> **the portions of the record, including the pleadings and discovery, which demonstrate the absence of a genuine issue of material fact.'"** ***Middleton v. Holbrook***, **3d Dist. Marion No. 9-15-47, 2016-Ohio-3387, 2016 WL 3223956, ¶ 8, quoting *Reinbolt v. Gloor*, 146 Ohio App.3d 661, 664, 767 N.E.2d 1197 (3d Dist.2001).**

*Williams v. ALPLA, Inc.*, 2017-Ohio-4217, 92 N.E.3d 256 (3d Dist.).

> **'The burden then shifts to the party opposing the summary judgment.' "In order to defeat summary judgment, the nonmoving party may not rely on mere denials but 'must set forth specific facts showing that there is a genuine issue for trial.'"**

(Citations omitted.) *Bates Recycling, Inc. v. Conaway*, 2018-Ohio-5056, 126 N.E.3d 341, ¶ 10-11 (3d Dist.), quoting *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 10, quoting Civ.R. 56(E).

{¶43} Appellate courts consider a summary judgment order under a de novo standard of review. *James B. Nutter & Co. v. Estate of Neifer*, 3d Dist. Hancock No. 5-16-20, 2016-Ohio-7641, ¶ 5. "[B]ecause summary judgment is a procedural device to terminate litigation, it must be awarded with caution." *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-359, 604 N.E.2d 138 (1992). For this reason, on appeal, "[t]he nonmoving party * * * receives the benefit of all favorable inferences when evidence is reviewed for the existence of genuine issues of material facts." *Ditech Financial, LLC v. Akers*, 3d Dist. Union No. 14-18-02, 2018-Ohio-2874, quoting *Byrd* at ¶ 10.

*First Assignment of Error*

**{¶44}** Angelina argues that the appellees were not entitled to summary judgment on her wrongful termination in violation of public policy claim.

Legal Standard

**{¶45}** "In Ohio, the common-law doctrine of employment at will governs employment relationships. The act of terminating an at-will employee's relationship with an employer usually does not give rise to an action for damages." *Dohme v. Eurand Am., Inc.*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, ¶ 11. Generally, "absent an employment contract, an employee is at will and may be terminated at anytime for any lawful reason or for no reason at all." *Alexander v. Cleveland Clinic Found.*, 8th Dist. Cuyahoga No. 95727, 2012-Ohio-1737, ¶ 20.

**{¶46}** However, there is "an exception to the employment-at-will doctrine that applies when an at-will employee is discharged or disciplined for reasons that contravene clear public policy expressed by the legislature in its statutes." *Sutton v. Tomco Machining, Inc.*, 129 Ohio St.3d 153, 2011-Ohio-2723, 950 N.E.2d 938, ¶ 8. Under this exception, the common law doctrine of employment at will "yield[s] when it contravenes the public policy as established by the General Assembly in R.C. 4123.90." *Id*.

**{¶47}** Under this exception, an action for wrongful discharge in violation of public policy exists where a plaintiff establishes the following:

> **(1) a clear public policy exists and is manifested in a state or federal constitution, in statute or administrative regulation, or in the common law (the clarity element), (2) dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element), (3) the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element), and (4) the employer lacked an overriding legitimate business justification for the dismissal (the overriding-justification element).** *Collins v. Rizkana* **(1995), 73 Ohio St.3d 65, 69-70, 652 N.E.2d 653. The clarity and jeopardy elements involve questions of law; the causation and overriding-justification elements involve questions of fact.** *Id.* **at 70.**

*Sutton* at ¶ 9. R.C. 4123.90 reads as follows:

> **No employer shall discharge, demote, reassign, or take any punitive action against any employee because the employee filed a claim or instituted, pursued or testified in any proceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer.**

R.C. 4123.90. After examining this statutory provision, the Supreme Court of Ohio held that there is

> **a common-law tort claim for wrongful discharge in violation of public policy when an injured employee suffers retaliatory employment action after an injury but before he or she files, institutes, or pursues a workers' compensation claim.**

*Id.* at ¶ 37. Thus, "*Sutton* creates a very limited exception to the at-will employment doctrine for injured employees who suffer retaliation prior to instituting or pursuing a workers' compensation claim." *Arnett v. Precision Strip, Inc.*, 2012-Ohio-2693, 972 N.E.2d 168, ¶ 19 (3d Dist.), quoting *Rose v. CTL Aerospace, Inc.*, 12th Dist. No. CA2011-09-171, 2012-Ohio-1596, ¶ 16.

{¶48} Courts have used a burden shifting framework in analyzing the causation and overriding-justification elements of a wrongful termination in violation of public policy claim. *White v. Simpson Industries, Inc.*, 1 Fed.Appx. 462, 468 (6th Cir. 2001); *Hall v. ITT Automotive*, 362 F.Supp.2d 952, 963 (N.D. Ohio 2005); *Kittle v. Cynocom Corp.*, 232 F.Supp.2d 867, 874-875, (S.D. Ohio 2002); *Whitaker v. First Energy Nuclear Operating Co.*, 6th Dist. Ottawa No. OT-12-021, 2013-Ohio-3856, ¶ 31; *Sells v. Holiday Mgt. Ltd.*, 10th Dist. Franklin No. 11AP-205, 2011-Ohio-5974, ¶ 39.

{¶49} Under this framework, if the plaintiff establishes some evidence of causation, the employer is to "offer[] evidence of an overriding business justification for [the employee's] termination." *Putney v. Contract Bldg. Components*, 3d Dist. Union No. 14-09-21, 2009-Ohio-6718, ¶ 70. In response, the plaintiff must identify or "produce evidence that the [employer] lacked such justification." *Id.* (implicitly applying this burden shifting framework to a wrongful termination in violation of public policy claim).

{¶50} "To establish causation, a plaintiff who alleges wrongful discharge in violation of public policy as expressed in R.C. 4123.90 must prove that the adverse employment action was retaliatory * * *." *Sutton, supra*, at ¶ 37. "[N]o presumption of retaliation arises from the fact that an employee is discharged soon after an injury." *Id.* at ¶ 10. Rather, "the law requires the plaintiff to show *purposeful* retaliation; that is, a specific intent to discharge an employee for

engaging in the protected act of filing a workers' compensation claim." (Emphasis sic.) *Glenn v. Hose Master, L.L.C.*, 2016-Ohio-1124, 61 N.E.3d 609, ¶ 11 (8th Dist.). Thus, a plaintiff must prove, by a preponderance of the evidence, that there was "a nexus between the adverse employment action and the potential workers' compensation claim." *Sutton, supra*, at ¶ 10, 37.

{¶51} "To establish the overriding-justification element, [the plaintiff] must prove that [the employer] lacked an overriding business justification for firing him [or her]." *Sutton, supra*, at ¶ 10. If the employer produces evidence that it had an overriding, legitimate business justification for the employee's termination, then the plaintiff may demonstrate a genuine issue of material fact exists as to this element by identifying evidence that the purported overriding, legitimate business justifications were pretextual. *Sells, supra*, at ¶ 22.

{¶52} While the causation and overriding-justification elements of this claim are questions of fact,

> **'courts routinely grant summary judgment when the plaintiff fails to raise an issue of material fact with respect to either element.' *Kirk v. Shaw Environmental, Inc*. (May 25, 2010), N.D. Ohio No. 1:09-CV-1405 [2010 WL 1387887. '[U]pon the movant's showing the lack of causation and the existence of overriding justification through depositions, the [plaintiff] has the reciprocal burden to demonstrate causation and the lack of an overriding justification' to avoid summary judgment. *Barnes v. Cadiz*, 7th Dist. No. 01 531 CA, 2002-Ohio-1534, ¶ 15.**

*Sells, supra*, at ¶ 39.

Legal Analysis

**{¶53}** Angelina argues that her claim of wrongful termination in violation of public policy fits within the exception that the Ohio Supreme Court delineated in *Sutton*. *Sutton, supra*, at ¶ 37. Since Angelina relies upon the *Sutton* analysis to satisfy the questions of law raised by the clarity element and the jeopardy element, our analysis will be limited to whether she has identified genuine issues of material fact that exist for trial regarding the causation and overriding-justification elements of the public policy exception test. *See Id*. at ¶ 28.

**{¶54}** To substantiate the causation element, Angelina first argues that her employer instructed her not to file a workers' compensation claim and told her not to report a workplace injury. Angelina Deposition, 146. In his deposition, Henry denied telling Angelina not to file a workers' compensation claim and also stated that McClain did not tell Angelina that she should not file a workers' compensation claim. Henry Deposition, 62. Henry said,

> **I told her if she wanted to file a workers' comp, file it; if you want to just go to the hospital, get it done, taken care of, our company would pay for it, regardless. Regardless, it would be paid for.**
>
> **\* \* \***
>
> **You got your choice. You can file it or you can go and get it done. I've done it many a time. They paid my bill without filing workers' comp.**

*Id*. at 61-63. In an affidavit, Henry stated the following:

> **I never told Angelina not to file a workers' compensation claim. I told her if she wanted to file a workers' compensation claim, then file it. If she wanted to just go to the hospital and have her medical bills taken care of, then the company would pay for her and she didn't have to file a workers' compensation claim. That's the choice that everyone at Lima Auto Mall can make—the company will pay your bills, but if you want to file a workers' compensation claim then you can file it. Other employees at Lima Auto Mall have filed workers' compensation claims. For example, Jeff McDaniel filed a workers' compensation claim for a back injury. He still works at Lima Auto Mall.**

Doc. 29, Ex. B. In his deposition, however, McClain testified: "I said, don't file a workman's comp, I'll pay for whatever it takes, the hospital bill. Which I do that to all employees. I was advised to do that by workman's comp, when I went to meetings in Columbus, at OADA [Ohio Automobile Dealers Association]." McClain Deposition, 68. McClain then stated that Lima Auto Mall had paid for Angelina's medical bills. *Id*. at 70-71.

{¶55} While there is a dispute about whether Henry told Angelina not to file a workers' compensation claim, Angelina does not dispute that Henry indicated to her that Lima Auto Mall would cover the costs of her medical bills in the event that she did not file a workers' compensation claim. Angelina Deposition, 146. Further, Angelina does not contend that Lima Auto Mall did not pay for her medical bills. Her testimony also indicates that she applied for and received short term disability benefits from Lima Auto Mall's insurer for the duration of her time away from work. Angelina Deposition, 215. McClain Deposition, 70-71.

{¶56} According to Henry and McClain's testimony, the process at Lima Auto Mall, following a workplace injury, was to have the injured employee either file a workers' compensation claim or have the company pay for the cost of the relevant medical bills. The fact that Angelina had Lima Auto Mall pay for her medical bills would lead Henry and McClain to believe that she was not going to file a workers' compensation claim. *See Glenn*, *supra*, at ¶ 32. Thus, Angelina's first argument does not demonstrate that Henry or McClain believed Angelina was going to file a workers' compensation claim and that this belief, in turn, motivated her termination.

{¶57} Angelina next argues that the "temporal proximity" between her termination on January 15, 2018 and the filing of her workers' compensation claim on January 26, 2018 establishes causation. Appellant's Brief, 15-16. *See* Angelina Deposition, 105, 130. Ex. D. In her brief, Angelina cites to a rule enunciated in *Knepper v. Ohio State University*:

> **Close temporal proximity between the employer's *knowledge* of the protected activity and the adverse employment action alone may be significant enough to constitute evidence of a causal connection, but only if the adverse employment action occurs 'very close' in time *after* an employe[r][1] learns of a protected activity.**

---

[1] In *Knepper*, the rule states "employee" instead of "employer." *Knepper, supra*, at ¶ 27. We understand this to be a typo. In a case released five days before *Knepper*, the Tenth District stated this rule as follows: "[w]here an adverse employment action occurs very close in time after an *employer* learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." (Emphasis added.) *Sells, supra*, at ¶ 33, quoting *Mickey v. Zeidler Tool & Die Co*., 516 F.3d 516, 525 (6th Cir. 2008).

(Emphasis added.) *Knepper v. Ohio State Univ.*, 10th Dist. Franklin No. 10AP-1155, 2011-Ohio-6054, ¶ 27. In this analysis, it is "knowledge coupled with a closeness in time that creates an inference of causation." *Knepper* at ¶ 27. *See Putney, supra*, at ¶ 57 (holding that it is a "small subset of cases where temporal proximity alone may be sufficient to establish causality.").

{¶58} In this case, Angelina did not file a workers' compensation claim until after she was terminated. Angelina Deposition, 101. Henry and McClain did not have knowledge that Angelina had engaged in this protected activity of filing a workers' compensation claim until after she was terminated. In *Karsnak v. Chess Fin. Corp.*, the Eighth District considered a situation in which an employee filed a complaint with the EEOC one day after she was terminated and held

> **That an event in the future could cause something in the past is a proposition that would challenge the space-time continuum. We dare not challenge the fabric of our existence. It is for this reason that we cannot find that the filing of the EEOC was the protected activity that caused [the employer's] termination of appellant.**

*Karsnak v. Chess Fin. Corp.*, 8th Dist. Cuyahoga No. 97312, 2012-Ohio-1359, ¶ 45. *See Meyers v. Goodrich Corp.*, 8th Dist. Cuyahoga No. 95996, 2011-Ohio-3261, ¶ 22. Thus, the mere closeness in proximity between these two events does not, by itself, suggest a causal connection.

{¶59} More importantly, there is also no evidence that Henry or McClain knew that Angelina was going to file a workers' compensation and preemptively terminated her. In fact, Angelina cannot demonstrate that her employer knew that

she was going to file a workers' compensation claim at the time that she was terminated because her testimony does not indicate that she was even considering such an action at the time that she was terminated. Angelina Deposition, 88, 108. She testified that she met with a lawyer a few days after she lost her job and then decided to file a workers' compensation claim. Angelina Deposition, 101, 108. While seeking medical treatment for her shoulder, Angelina also told the relevant medical professionals that she had injured her shoulder while reaching for something in a cabinet. *Id.* at 150-152, 180. These statements do not suggest that she anticipated filing a workers' compensation claim at that time.

{¶60} Since there is no evidence that Henry and McClain were aware that Angelina was going to file a workers' compensation claim, the temporal proximity between her termination and the filing of her workers' compensation claim cannot establish causation. *See Ferguson v. ProMedica Central Physicians. LLC*, 2018-Ohio-4358, 114 N.E.3d 429, ¶ 27 (6th Dist.) (granting summary judgment where the plaintiff alleged retaliation but could not establish the employer was aware of the protected activity). In the absence of some evidence that demonstrates her employer was aware that she was going to file a workers' compensation claim, Angelina cannot establish how filing a workers' compensation claim after her termination proves that filing a workers' compensation claim caused her termination. *See Putney, supra*, at ¶ 57.

{¶61} Angelina also mentions the date of her injury in this argument. However, the temporal proximity between Angelina's injury and her termination also does not, by itself, establish causation. While there is no evidence that Henry or McClain knew that Angelina was going to file a workers' compensation claim, Henry and McClain were aware of Angelina's injury. However, under *Sutton*, "no presumption of retaliation arises from the fact that an employee is discharged soon after an injury." *Sutton, supra*, at ¶ 10. In *Sutton*, the plaintiff was terminated within one hour of his employer having been informed that he had suffered a workplace injury. *Sutton, supra*, at ¶ 2.

{¶62} Unlike the facts in *Sutton*, Lima Auto Mall did not terminate Angelina before she had an opportunity to file a workers' compensation claim. In the case before this Court, Angelina reported that she was injured at work over one month before she was terminated. Angelina Deposition, 130. *See O'Malley-Donegan v. MetroHealth System*, 2017-Ohio-1362, 89 N.E.3d 113, ¶ 24 (8th Dist). The fact that Angelina could have filed a workers' compensation claim at the time that she was terminated does not indicate that she was terminated for a reason related to a workers' compensation claim. *See Glenn, supra*, at ¶ 31 (finding an argument for retaliatory termination to be speculative and without merit because it relied on the fact that an employee might file a workers' compensation claim). Angelina has the burden of establishing that Lima Auto Mall engaged in "*purposeful* retaliation,"

having "a specific intent to discharge [her] for engaging in the protected act of filing a workers' compensation claim." (Emphasis sic.) *Id.*

{¶63} Further, in the one-month period of time in between Angelina's injury and her termination, her employer paid for her medical bills; Angelina received short-term disability benefits from Lima Auto Mall's insurer; and Henry attempted to schedule her for light duty. McClain Deposition, 61, 71. Considering this context, the temporal proximity between Angelina's injury and her termination does not suggest that her employer was motivated to terminate her by considerations related to the relevant public policy regarding workers' compensation claims.

{¶64} While Angelina was terminated in between her date of injury and the point at which she filed her workers' compensation claim, she has not pointed to facts in the record that would connect her employer's decision to terminate her and her decision to file a workers' compensation claim. *See Sutton, supra*, at ¶ 10. There is no evidence in the record that indicates Henry or McClain was aware that Angelina was going to file a workers' compensation claim and terminated Angelina for this reason. Thus, Angelina has not identified evidence that would create a genuine issue of material fact as to the causation element of her wrongful termination in violation of public policy claim.

{¶65} Even if Angelina had provided evidence for the causation element, her claim would still fail because she has not alleged facts that create a genuine issue of material fact as to whether Lima Auto Mall lacked an overriding, legitimate business

justification for her termination. In the affidavits attached to its motion for summary judgment, Lima Auto Mall provided two overriding, legitimate business justifications for Angelina's termination: (1) the company was reducing their workforce to cut costs and (2) Angelina was argumentative or insubordinate at work. Doc. 29, Ex. A. *See Boggs v. The Scotts Company*, 10th Dist. Franklin No. 04AP-425, 2005-Ohio-1264, ¶ 19 (determining that a reduction in force was a legitimate business purpose that justified termination); *Thompson v. Gynecologic Oncology & Pelvic Surgery Assoc.*, 10th Dist. Franklin No. 06AP-340, 2006-Ohio-6377, ¶ 26, 31 (determining that personality conflicts were an overriding, legitimate business justification for termination).

{¶66} As to the reduction in force, McClain said that Lima Auto Mall's "sales have been going down * * *" and that his business manager informed him that "we have way too many people in the detail shop." McClain Deposition, 13. He stated that he was "trying to cut expense[s]" and that employees were the "biggest expense." *Id*. at 13-14. Further, McClain testified that no one was hired to replace Angelina after she was terminated. Doc. 29, Ex. A. McClain also stated that another employee of the detail department left Lima Auto Mall four to six weeks after Angelina was terminated and that this employee was also not replaced. *Id*. at 83. In his deposition, Henry testified that Lima Auto Mall "wasn't doing that well in business" and that they "had too many people" working there. Henry Deposition,

49, 56. He further said that they "were losing money, in the shop. We had to let somebody go." *Id*. at 69.

**{¶67}** As to the argumentativeness or insubordination, Henry testified that Angelina "had a mouth." Henry Deposition, 9. He said that Angelina "sometimes" intimidated him; that she would tell him how to do his job; and that "[i]t upset him." *Id*. at 10, 19. Henry stated that Angelina "would tell [one of her African American coworkers], you know, black people shouldn't be doing this, or you think black people are better than white people, and that kind of stuff. And I had to step in * * *." *Id*. at 18. He also stated that his verbal performance evaluation of Angelina was "keep up the work, but keep your trap shut." *Id*. at 31.

**{¶68}** In his deposition, McClain explained that he had "a right to lay people off because we have lack of work. I know that she's been a problem, and I did what I had to do * * *." McClain Deposition, 8-89. He further stated that Angelina was "overbearing"; that she "had a way about intimidating people"; that she "coerced other employees, with her mouth"; and that Henry could not "handle her." *Id*. at 10, 90-91. He also said that Angelina "refus[ed] [Henry's] orders, when he told * * * her to do something was—number one, that's bad, in front of the other people. She did not respect her father." *Id*. at 89. He also stated that the other employees would complain about Angelina to him and that she was "mouthy." *Id*. at 10-11, 90.

**{¶69}** With this testimony, Lima Auto Mall produced evidence of overriding, legitimate business justifications for Angelina's termination. *See Sells, supra*, at ¶

34. In response, Angelina asserts that Lima Auto Mall's justifications shifted over time from a reduction in force to insubordination or argumentativeness, indicating that these reasons were pretextual. *See Id.* at ¶ 27 (holding that "[a] court will not, however, infer pretext from an employer's assertion of different, although consistent, reasons for taking an adverse action.").

{¶70} However, from Angelina's discharge paperwork to the appellees' motion for summary judgment, Lima Auto Mall has consistently cited a business slowdown as a basis for her termination. Ex. 3. Doc. 29, Ex. A, B. Further, McClain, Henry, and Angelina provided consistent testimony as to Angelina's argumentative behavior at work. Doc. 29, Ex. A, B. Henry Deposition, 13, 19, 38. McClain Deposition, 10, 43. Angelina Deposition, 73-74. Even if Lima Auto Mall's justifications for Angelina's terminations had shifted from reduction in force to argumentativeness or insubordination, these reasons are not inconsistent. The reduction in force was the reason *a* position in the detail department was terminated. Doc. 29, Ex. A. Angelina's argumentativeness or insubordination was the reason *her* position in the detail department was terminated. Doc. 29, Ex. A.

{¶71} We also note that, in her response, Angelina does not identify evidence that suggests Lima Auto Mall was not experiencing a business slowdown. Further, while Angelina testified that she was not insubordinate, she admitted to engaging in the behaviors that McClain and Henry identified as insubordination in their testimony. Angelina Deposition, 73-74. In her testimony, Angelina admitted that

she regularly argued with her supervisor, Henry, at work. *Id*. In other words, Angelina confirms the conduct that was a basis for her termination but disputes Lima Auto Mall's use of the label "insubordination" for this conduct. *See Wissler v. Ohio Dept. of Job and Family Services*, 10th Dist. Franklin No. 09AP-569, 2010-Ohio-3432, ¶ 24. She also admitted to arguing with her coworkers on a regular basis at work. Angelina Deposition, 73-74. Thus, Angelina has not carried the burden of establishing that there is a factual dispute over whether Lima Auto Mall lacked overriding, legitimate business justifications for her termination.

{¶72} In the end, Angelina has not established the causation element by pointing to evidence that would establish a connection between Lima Auto Mall's decision to terminate her and her subsequent decision to file a workers' compensation claim. Angelina also has not identified facts in the record that indicate that her employer lacked overriding, legitimate business justifications for her termination. After reviewing the evidence in a light most favorable to the nonmoving party, we conclude that Angelina has not carried the burden of establishing that genuine issues of material fact exist for trial on this claim. Thus, Angelina's first assignment of error is overruled.

*Second Assignment of Error*

{¶73} Angelina asserts that the appellees were not entitled to summary judgment on her gender discrimination claim.

Legal Standard

**{¶74}** R.C. 4112.02 prohibits certain discriminatory employment practices

and reads, in its relevant part, as follows:

> **It shall be an unlawful discriminatory practice:**
>
> **(A) For any employer, because of the \* \* \* sex \* \* \* of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.**

R.C. 4112.02(A). The Supreme Court of Ohio has "determined that federal case

law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e et seq.,

Title 42, U.S.Code, is generally applicable to cases involving alleged violations of

R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Committee v.*

*Ohio Civil Rights Commission*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128, 131 (1981).

**{¶75}** In Ohio, a plaintiff may establish a discrimination claim under the

*McDonnell Douglas Corp. v. Green* framework. *Jones v. MTD Consumer Group,*

*Inc.*, 2015-Ohio-1878, 32 N.E.3d 1030, ¶ 27 (9th Dist.), citing *McDonnel Douglas*

*Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under

this framework,

> **[t]o establish a prima facie case of discrimination, a plaintiff must show: (1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) replacement by a non-protected person.**

*Putney, supra*, at ¶ 25, quoting *McDonnell Douglas Corp*. at 802.

> **However, "[a] plaintiff can also make out a prima facie case by showing, in addition to the first three elements, that 'a comparable non-protected person was treated better.'" *Mitchell v. Toledo Hosp*. (C.A.6, 1992), 964 F.2d 577, 582 (internal citations omitted). Under this element, a plaintiff 'must produce evidence which at a minimum establishes (1) that he [or she] was a member of a protected class and (2) that for the same or similar conduct he [or she] was treated differently than similarly-situated non-minority employees.' *Id*. at 582-83.**

*Putney* at ¶ 25.

{¶76} "To demonstrate that a co-worker is similarly-situated, '[T]he plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the *relevant* aspects.""" (Emphasis sic.) *Brehm v. MacIntosh Company*, 10th Dist. Franklin No. 19AP-19, 2019-Ohio-5322, ¶ 29, quoting *Ercegovich v. Goodyear Tire & Rubber Co*., 154 F.3d 344, 352 (6th Cir. 1998), quoting *Pierce v. Commonwealth Life Ins. Co*., 825 F.Supp. 783, 802 (E.D. Ky.1993). Further, in *Mitchell v. Toledo Hosp*.,

> **[t]he Sixth Circuit has held that "to be deemed 'similarly-situated' in the disciplinary context, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"**

*Putney* at ¶ 31, quoting *Ercegovich* at 352, quoting *Mitchell* at 583. However, the Sixth Circuit, in *Ercegovich*, also held that

> **[c]ourts should not assume * * * that the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but [courts] should make an independent**

> **determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee.**

*Ercegovich* at 352. *See Putney* at ¶ 32. Further, "[a] person is not similarly situated unless the conduct engaged by the proffered individual is of 'comparable seriousness' to the conduct that predic[a]ted the employee/plaintiff's termination." *Waddell v. Grant/Riverside Medical Care Foundation*, 2017-Ohio-1349, 88 N.E.3d 664, ¶ 33 (10th Dist.).

**{¶77}** "An employee's burden in demonstrating discrimination is heavier when a reduction in force is required by economic necessity." *Hamilton v. Sysco Food Servs. of Cleveland, Inc.*, 170 Ohio App.3d 203, 2006-Ohio-6419, 866 N.E.2d 559, ¶ 15 (8th Dist.), citing *Carpenter v. Wellman Prods. Group*, 9th Dist. Medina App. No. 03CA0032-M, 2003-Ohio-7169, ¶ 17.

> **A workforce reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge.**

*Carpenter* at ¶ 16. "For purposes of summary judgment, a plaintiff must submit evidence from which a reasonable jury could conclude that the plaintiff established a prima facie case of discrimination." *Housden v. Wilke Global, Inc.*, 2018-Ohio-3959, 111 N.E.3d 1264, ¶ 27 (10th Dist.).

**{¶78}** If a plaintiff establishes a prima facie case of gender discrimination, then there is a presumption of discrimination. *Williams v. Akron*, 107 Ohio St.3d

203, 2005-Ohio-6268, 837 N.E.2d 1169, ¶ 11. "Once a plaintiff establishes [a] prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Putney* at ¶ 25, citing *Texas Dept. of Comm. Affairs v. Burdine* (1981), 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207.

> **The employer meets its burden of production by submitting admissible evidence that 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' and in doing so rebuts the presumption of discrimination that the prima facie case establishes. (Emphasis sic.) *Williams* at ¶ 12, quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).**

*Housden* at ¶ 20. "The employer's burden is one of production, not of persuasion." *Waddell, supra*, at ¶ 28. "The ultimate burden of persuasion always remains with the plaintiff." *Ames, supra*, at ¶ 27.

{¶79} If the employer carries the burden of producing evidence that establishes nondiscriminatory reasons for the adverse employment action, then

> **'the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not the true reasons, but were a pretext for discrimination.'**

*Putney* at ¶ 25, quoting *Burdine, supra*, at 252-253. "To establish such pretext, a plaintiff must show either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge." *Jones v. MTD Consumer Group, Inc.*, 2015-

Ohio-1878, 32 N.E.3d 1030, ¶ 27 (9th Dist.), quoting (Citations and emphasis omitted.) *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir.2008). *See also Waddell, supra*, at ¶ 29.

Legal Analysis

{¶80} In this case, there is no dispute as to the first three elements of the prima facie case of gender discrimination. Appellees' Brief, 13. First, Angelina, as a female, is a member of a protected class. Angelina Deposition, 198. Second, McClain and Henry both stated that Angelina was qualified for her job. McClain Deposition, 24, 26. Henry Deposition, 21-22. Angelina Deposition, 41. Third, there was adverse employment action as Angelina's job was terminated. Henry Deposition, 66. McClain Deposition, 26.

{¶81} However, there is an issue, on appeal, as to whether Angelina has substantiated the fourth element of a gender discrimination claim. To satisfy this element, Angelina must either demonstrate (1) that Lima Auto Mall replaced her with a male or (2) that Lima Auto Mall did not treat her as favorably as another similarly situated male after engaging in the same conduct as Angelina. *Putney, supra*, at ¶ 25. McClain stated that Angelina's position was not filled after her departure because her termination was part of a reduction in force. Doc. 29, Ex. A. Further, McClain and Henry stated business was slowing down at Lima Auto Mall and that Angelina was not replaced because of a reduction in force. Doc. 29, Ex. A,

B.  In response, Angelina does not allege that Lima Auto Mall replaced her with a male or that Lima Auto Mall was not engaged in a reduction in force.

{¶82} Rather, to carry the burden of establishing the fourth element, Angelina first argues that her termination allowed for the retention of a male detailer, Dennis Hapner ("Hapner").  She then argues that another male detailer at Lima Auto Mall, Paul Duckett ("Duckett"), was treated more favorably than she was by her employer.  Angelina, Hapner, and Duckett were each detailers who had worked under Henry's supervision at Lima Auto Mall.  Angelina Deposition, 65, 200.  Doc. 29, Ex. A.  We will examine the record to determine whether Angelina has established that these male counterparts were treated more favorably than she was after engaging in the same type of conduct that led to her termination.

{¶83} McClain stated that Angelina was terminated and Hapner was retained because Angelina argued with her supervisor, Henry, at work and "would 'stir the pot' with other workers by starting arguments about politics and sports * * *."  Doc. 29, Ex. A.  Hapner, on the other hand, did not engage in such behavior.  McClain Deposition, 92.  Henry also stated that he and Angelina "would get face-to-face arguing" at work.  Doc. 29, Ex. B.  Henry Deposition, 19, 38.  Angelina admitted that she argued with her coworkers but also indicated that her coworkers all argued with each other in the detail shop.  Angelina Deposition, 73-74.  However, Angelina also admitted that she frequently argued with her supervisor at work but nowhere alleged that Hapner ever argued with Henry at work.  *Id.*

{¶84} Further, an examination of the record does not reveal any evidence of a pattern of conflict between Hapner and his supervisor, Henry. *See Ames v. Ohio Dept. of Rehab. & Corr.*, 2014-Ohio-4774, 23 N.E.3d 162, ¶ 26 (10th Dist.) (considering the plaintiff's pattern of conflict with coworkers in a comparable seriousness analysis). Since Angelina has not pointed to any evidence that Hapner ever argued with Henry at work, she has not demonstrated that Hapner was treated more favorably than she was after engaging in the same pattern of conduct that led to her termination. *See Stipkala v. Bank One, N.A.*, 9th Dist. Summit No. 21986, 2005-Ohio-16, ¶ 15 (holding the plaintiff had to demonstrate that the proffered, similarly situated coworker "engaged in the same conduct but was either not disciplined or not disciplined as severely as" the plaintiff.).

{¶85} Angelina also argues that her employer treated her less favorably than Duckett. At the time that Angelina was terminated, Duckett was no longer working at Lima Auto Mall. Henry Deposition, 30. Thus, Angelina's termination did not facilitate Duckett's retention. However, Angelina has also not identified any evidence that indicates Duckett ever argued with Henry at work. Further, the record does not contain evidence that indicates there was a pattern of conflict between Duckett and Henry. It is also unclear from the record if Lima Auto Mall was in the process of a reduction in force at the time Duckett was employed.

{¶86} Angelina points to the fact that Duckett had fallen asleep while he was at work and had not been terminated for this conduct. Angelina Deposition, 67.

The record indicates that Henry had written up Duckett for falling asleep at work. Henry Deposition, 30. Duckett then produced a doctor's note that indicated he had a sleeping disorder. *Id*. Subsequently, Duckett left to care for his father and never returned to work at Lima Auto Mall. *Id*. McClain stated that Duckett "quit before I could fire him." McClain Deposition, 46.

{¶87} Further, the record also indicates that Angelina's immediate predecessor was a male detailer who "gave Henry a very, very hard time" and was terminated for that reason. McClain Deposition, 14. Henry testified that employees have acted defiantly towards him in the past. Henry Deposition, 12-13. Henry said of these defiant employees: "they can either go out or I'll push them out." *Id*. Angelina has not pointed to any evidence that would put these facts into dispute. "In practical terms, two employees are not similarly-situated in all relevant respects if there is a meaningful distinction between them which explains their employer's differential treatment of them." *Poppy v. Willoughby Hills City Council*, 11th Dist. Lake No. 2004-L-015, 2005-Ohio-2071, ¶ 41. Angelina has not demonstrated that any similarly situated, male detailer at Lima Auto Mall was treated more favorably than she was after engaging in the same pattern of argumentative conduct with the supervisor of the detail department.

{¶88} Angelina also points to a comment made by McClain as evidence of a discriminatory intent. She testified that McClain, upon receiving medical documentation about the limitations that she had immediately following her injury,

made the following comment: "I wouldn't hire a one-armed man, let alone a one-armed woman. What am I supposed to do with someone with one arm?" Angelina Deposition, 142. There is a dispute as to the content of this comment.

**{¶89}** McClain only admits to saying that he "wouldn't hire a one-armed person." Doc. 29, Ex. A. He did not admit to saying the portion about a "one-armed woman." Doc. 29, Ex. A. McClain Deposition, 67. He further explained that this statement was intended "as a joke." Doc. 29, Ex. A. McClain Deposition, 67. A jury could very well believe McClain when he says that did not make any reference to Angelina's gender or that he intended this comment only as a joke. However, when examining a motion for summary judgment, we must examine this comment in a light most favorable to the non-moving party: Angelina. *See Conway v. Paisley House*, 7th Dist. Mahoning No. 02CA135, 2003-Ohio-4609, ¶ 15, 22.

**{¶90}** At the outset, we note that Angelina did not present this comment as direct evidence of discriminatory intent to the trial court.[2] *See Smith v. Kelly*, 2d Dist. Clark No. 2011 CA 77, 2012-Ohio-2547, ¶ 32. On the one hand, this comment,

---

[2] On appeal, Angelina refers to McClain's statement as "direct evidence." The words "direct evidence" can refer to a type of evidence or, in the context of a gender discrimination claim, a method of proof. *Mauzy v. Kelly Services, Inc*., 75 Ohio St.3d 578, 586, 664 N.E.2d 1272, 1279 (1996). This method of proof is an alternative to the *McDonnell Douglas* analysis. *Rowan v. Lockheed Martin Energy Systems, Inc*., 360 F.3d 544, 548 (6th Cir. 2004). In this case, Angelina does not set forth the legal standard for the direct evidence framework; does not cite to cases that rely on this standard; did not refer to this comment as direct evidence to the trial court; and did not refer to the direct evidence legal standard to the trial court. Rather, to the trial court and this Court, Angelina has set forth the *McDonnell Douglas* legal standard and has structured her entire argument for gender discrimination around the *McDonnell Douglas* burden-shifting framework. For this reason, we will consider McClain's comment within the context of the *McDonnell Douglas* burden shifting framework.

as related by Angelina, was made by the person who decided to terminate Angelina; was related to her status as an employee; directly referenced Angelina's gender; and was made within one month of her termination. On the other hand, from the evidence produced by Angelina, this comment also does not appear to be a part of a broader pattern of such commentary from McClain. Angelina affirmed that McClain was not "abusive" towards her. Angelina Deposition, 101. She also does not identify other similar comments from McClain, affirming at the end of her deposition that she had no "other statements that [she] would consider outrageous or outlandish" to offer from McClain. Angelina Deposition, 210.

{¶91} We also note that

> **[a]n employer can demonstrate a nondiscriminatory intent with regard to demotion or termination of an employee through the 'same actor' inference. Where the same actors make positive and adverse employment decisions about an individual, especially within a short time period, a court may strongly infer a nondiscriminatory motivation in the later action.**

*Crawford v. Kirtland Local School Board of Education*, 124 N.E.3d 269, 2018-Ohio-4569, ¶ 69, quoting *Pirsil v. Internatl. Steel Group Cleveland*, 8th Dist. Cuyahoga No. , 2005-Ohio-3013, ¶ 14.

> **An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class. This general principle applies regardless of whether the class is age, race, sex, or some other protected classification.**
>
> **In discrimination cases where the employee's class does not change, it remains possible that an employer who has nothing**

-46-

**against women per se when it hires a certain female will have nothing against women per se when it fires that female, regardless of the number of years that pass.**

*Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461 (6th Cir. 1995).

**{¶92}** In this case, Lima Auto Mall has identified facts in the record that indicate the same actor inference is applicable in this situation. McClain is the individual who hired and terminated Angelina. McClain Deposition, 21, 23. He had known her before she was hired and gave her a job at Lima Auto Mall in the absence of an interview. McClain Deposition, 23. Angelina Deposition, 46. He also gave Angelina a raise upon her request even though this was not the standard method to award pay increases. Doc. 29, Ex. A. *See Pulver v. Rookwood Highland Tower Investments*, 1st Dist. Hamilton No. Nos. C-950361, C-950429., 1997 WL 133422, *8 (Mar. 26, 1997) (considering a pay increase under the same actor inference analysis). Thus, McClain has alleged facts sufficient to raise the same actor inference. *See Pirsil* at ¶ 16; *Crawford* at ¶ 70.

**{¶93}** Assuming that Angelina had set forth facts that establish a prima facie case for gender discrimination, Lima Auto Mall provided legitimate, nondiscriminatory reasons for her termination in their motion for summary judgment. Further, she is not able to demonstrate that these nondiscriminatory reasons for her termination are pretextual. We will proceed through this analysis. Angelina's employer gave two nondiscriminatory reasons for her termination in their motion for summary judgment. First, they assert that *a* detailing position was

terminated because they were reducing their workforce as a result of a general slowdown in their business. Doc. 29. Second, they assert that *Angelina's* detailing position was terminated because she was argumentative or insubordinate. Doc. 29. We turn to examining these reasons in further detail.

{¶94} Regarding the termination of a detailing position, McClain stated that Lima Auto Mall used to have eight franchises and employed up to 130 people. Doc. 29, Ex. A. By the time that this action was instituted, Lima Auto Mall had two franchises and roughly sixty employees. Doc. 29, Ex. A. McClain Deposition, 13, 18. McClain further stated that another detailer left four to six weeks after Angelina was terminated and that this other position had not been filled. McClain Deposition, 83. Henry testified that there were too many employees and that business was "not doing that well." Henry Deposition, 49.

{¶95} As to why Angelina was terminated, McClain made the following statements in an affidavit filed with the appellees' motion for summary judgment:

> **15. During the time that Angie was in the detail department, she did good work, but she was 'mouthy,' she would 'stir the pot' with other workers by starting arguments about politics and sports, and she would act insubordinate with her supervisor who was also her father. She annoyed other employees because she constantly talked about her family and made others feel like she was better than them.**

> **16. While Angie was off work after her injury, the detail department was noticeably more peaceful. The constant arguing among workers that persisted while Angie was there had stopped in her absence. Additionally, the detail department continued to function smoothly. It became clear to me that I had too many**

> **detailers working back there for the amount of detailing work we had, and it was time to let someone go to cut overhead costs.**
>
> **17. Since the business slowdown meant someone had to be let go, Angie became the obvious choice when it was seen how peaceful the detail department was in her absence combined with her history of arguing with co-workers and acting insubordinate with her supervisor, Henry Nance.**

Doc. 29, Ex. A. In his deposition, McClain also stated that Angelina "coerced other employees, with her mouth. They have even come to me and said, you know, I don't work for her." McClain Deposition, 90.

{¶96} McClain further stated that the other employees were "tired" of her telling them how to do their jobs and that

> **[i]t [was] not her job to intimidate or help. Her job was to detail cars and buff.**
>
> **\* \* \***
>
> **She went above that, by trying to manage her father's job. And her father had to get into her about doing it, because he got tired of it.**

McClain Deposition, 90-91. He also said,

> **A number of people that worked back there with her have made comments to me about the way she treated them; the way she would boss them or tell them how to do their job. She called it helping. But a lot of them took offense to the way she—she was kind of overbearing—she's very smart, in her opinion; and a lot of them were not very smart, according to her, and they didn't know what they were doing.**

He also said, "I guess they [Henry and Angelina] got into pretty good arguments, back there, in front of people." *Id*. at 10. McClain testified that Henry informed

him that "he don't know what to do with her" and that he could not "handle her." *Id.* at 91.

{¶97} In an affidavit, Henry stated that Angelina "intimidated" and "threaten[ed]" the other employees during their arguments. Doc. 29, Ex. B. He further stated:

> **5. Angie is a hard worker and good detailer but she gets "mouthy" and acted disrespectful to me as her supervisor. She would try to tell me how to do my job. She would bring up politics with the other workers and argue with them. Angie is very opinionated and vocal about her opinions. She liked to argue and was constantly starting arguments. She also often argued with the other workers about sports. She sometimes would try to goad others into arguing with her about her sexuality, but the other workers always refused to "take the bait."**
>
> **6. Sometimes Angie would argue about the job. She would tell me that I did not know how to do my job and we would get face-to-face arguing.**

Doc. 29, Ex. B. In his deposition, he further stated the following:

> **we're already losing money, in the shop. We had to let somebody go. Sooner or later, it was either going to be one of them. And, you know, Dalton, he worked, he was there every day; Dennis [Hapner], good worker, fantastic worker, there every day. Plus, I didn't have all this yelling and screaming all the time.**

Henry Deposition, 69-70. Henry reported that the detail department has been "much more peaceful with less arguing" in Angelina's absence. Doc. 29, Ex. B. After examining the evidence in the record, we conclude that Lima Auto Mall has carried the burden of producing evidence that Angelina was terminated for legitimate, nondiscriminatory reasons.

{¶98} In response, Angelina has the burden of establishing that these nondiscriminatory reasons are pretextual. To do this, Angelina must demonstrate: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge." *Jones, supra*, at ¶ 27, quoting *Russell, supra*, at 604. Angelina purports to use the first and third options to prove pretext. She advances arguments against each of Lima Auto Mall's two nondiscriminatory reasons for her termination.

{¶99} On appeal, Angelina argues against the reduction in force justification on the grounds that no one else in the detail department was terminated. Notably, Angelina nowhere disputes that Lima Auto Mall was experiencing a business slowdown. The fact that Lima Auto Mall did not terminate anyone else in the detail department does not indicate that the company was not engaged in a reduction in force. We note that there were only six positions under Henry's supervision at the time that Angelina was terminated. McClain Deposition, 14. The fact that her position was not filled after her termination establishes that this company was, in fact, reducing the number of positions in its detail department.

{¶100} Further, after Angelina was terminated, another employee left the detail department and was also not replaced. McClain Deposition, 83. By this time, there were only three and a half positions under Henry's supervision. *Id*. at 14. Thus, there is ultimately no factual dispute as to whether Lima Auto Mall was experiencing a business slowdown or as to whether Lima Auto Mall was in the

process of reducing its workforce at the time that Angelina was terminated. Angelina's argument does not demonstrate that Lima Auto Mall's claim—to be in the midst of a reduction in force—was factually untrue or that a reduction in force was not sufficient to motivate her discharge.

{¶101} On appeal, Angelina also argues that the reduction in force justification is pretextual because she was terminated even though she had more seniority than Hapner. *See* Angelina Deposition, 200. We note that Lima Auto Mall's handbook puts its employees on notice of the following policy:

> **In the event of a reduction in force, the Company will strive to take into account an employee's length of service with the Company, but skill ability, attitude about his/her work and other factors will play an important role.**

Ex. J. Under the company policy, Angelina, in the event of a reduction in force, was not guaranteed priority over Hapner because of her seniority. Ex. J. Further, Angelina further testified that she did not have a written contract of employment that provided a definite period for her employment and stated that she was not promised that she could work there for any specified period of time. Angelina Deposition, 212-213.

{¶102} Further, McClain stated that he did not cut Hapner's position because "[h]e was a better worker; no problems; no hassles." McClain Deposition, 92. He also stated that Hapner was "a good worker. He don't complain." *Id*. McClain reported that Angelina routinely argued with her supervisor and her coworkers while

at work. Doc. 29, Ex. A. Henry also stated that he and Angelina "would get face-to-face arguing" at work. Doc. 29, Ex. B. Henry Deposition, 19, 38. In her deposition, Angelina admitted to engaging in this type of behavior but pointed to the fact that her coworkers would also argue with her. Angelina Deposition, 73-74.

{¶103} However, Angelina also admitted that she argued with her supervisor at work but nowhere alleged that Hapner argued with their supervisor at work. *Id*. Further, an examination of the record does not reveal any evidence of a pattern of conflict between Hapner and his supervisor, Henry. Henry and McClain both testified that Hapner was a good employee who did not cause problems. McClain Deposition, 92. Henry Deposition, 69-70. There is no evidence in the record that indicates Hapner or any of Angelina's other male coworkers who were retained in the detail department ever argued with Henry; had to be repeatedly spoken to in Henry's office for argumentative behavior; or had to be given warnings for such behavior. Again, this argument does not establish that Lima Auto Mall was not, in fact, engaged in a reduction in force or that a reduction in force was not a sufficient reason for Angelina's discharge.

{¶104} Turning to the argument she raises against Lima Auto Mall's insubordination justification, she argues that this reason is pretextual because she was never formally disciplined for her argumentative or insubordinate conduct. However, McClain indicated that the reason Angelina was not, as a general matter, formally reprimanded was because Henry was both her father and her supervisor.

McClain Deposition, 86-87. Given this "unique situation," McClain stated that he did not formally reprimand Angelina and indicated that he allowed Henry, as her supervisor, to address any issues with Angelina in his own manner. *Id.* At the end of his deposition, McClain stated that Henry admitted that he, as her supervisor, could not "handle" Angelina. *Id.* at 92.

{¶105} Henry stated that he did not give her formal performance evaluations and also did not, as a general matter, formally reprimand Angelina. Henry Deposition, 32, 40. Instead, Henry stated that he would speak to her himself; that he would call her into his office for talks; and would, at times, threaten to send her home. *Id.* at 19, 40. He also indicated that, when other employees would have an issue with Angelina, they would speak to him. *Id.* at 14. He testified that he would tell these complaining employees that he would "handle it" and that he would then speak with Angelina. *Id.* Henry's testimony indicated that he repeatedly told Angelina not to behave in an argumentative manner but that this behavior continued nonetheless. *Id.* at 13, 19, 20, 31, 38, 40.

{¶106} Further, we also note that Henry did eventually fill out an employee warning notice for Angelina. Ex. L. Henry Deposition, 40-44. This document indicated that Henry instructed Angelina to return to work for light duty in December of 2017 but that Angelina did not return to work. Ex. L. Henry stated that this document was filed at Lima Auto Mall. Henry Deposition, 40. While Angelina stated that she had not seen this document, she does not dispute having a

heated argument with Henry on the phone regarding her return to work to perform light duty. Angelina Deposition, 98-9, 192. Angelina stated that, in this conversation, Henry was upset. *Id.* at 100. She said "[h]e was rambling about me getting fired * * *." *Id.* at 100.

{¶107} While Angelina disputes having been insubordinate, she admits to engaging in the argumentative conduct that Henry and McClain identified as insubordination. Angelina Deposition, 73-74, 97, 98-99. She admits that she frequently argued with her coworkers and her supervisor at work. *Id.* Henry and McClain testified that the detail department was peaceful in her absence and that this motivated their decision to terminate her position instead of another detailer's position. Doc. 29, Ex. A, B. They also indicate that previous employees of the detail department had been terminated for engaging in similar conduct prior to Angelina's time at Lima Auto Mall. McClain Deposition, 14. Henry Deposition, 12-13.

{¶108} The absence of a formal reprimand for argumentative or insubordinate behavior does not establish that she was not argumentative or insubordinate, especially when considering her own admissions about her workplace behavior. Further, this argument does not establish that the argumentative behavior in which she admittedly engaged did not provide sufficient grounds for termination. *See Thompson, supra*, at ¶ 31.

{¶109} As to the question of whether Angelina was argumentative or insubordinate, there is no dispute as to whether Angelina had a consistent pattern of argumentative behavior at work with her coworkers. It is also undisputed that Angelina routinely argued with her supervisor at work. Further, there is no evidence in the record that Angelina's coworkers in the detail department had a pattern of argumentative conflict with their supervisor, Henry. There is also undisputed evidence that previous employees in the detail department had been terminated for engaging in similar types of conduct toward Henry.

{¶110} After reviewing the evidence in a light most favorable to the non-moving party, we conclude that Angelina has not demonstrated that she was treated less favorably than her male coworkers after engaging in the same type of conduct. In the absence of such a showing, she could not establish a prima facie case for gender discrimination. Further, Lima Auto Mall was able to produce evidence of legitimate, nondiscriminatory reasons for her termination. In response, Angelina was not able to demonstrate that these nondiscriminatory reasons for her termination were pretextual by producing evidence that they either were factually untrue or were insufficient grounds for her discharge. After examining the facts in the record, we conclude that the trial court did not err in granting the appellees' motion for summary judgment. Thus, her second assignment of error is overruled.

*Third Assignment of Error*

**{¶111}** Angelina argues that the appellees were not entitled to summary judgment on her sexual orientation discrimination claim.

Legal Standard

**{¶112}** "The Supreme Court of Ohio has held that 'federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e et seq., Title 42, U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112.'" *Russel v. United Parcel Service*, 110 Ohio App.3d 95, 100, 673 N.E.2d 659 (10th Dist.), quoting *Plumbers & Steamfitters Commt. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 196, 421 N.E.2d 128, 131 (1981).

Legal Analysis

**{¶113}** Angelina states, in her brief, that discrimination on the basis of sexual orientation is not actionable under Ohio Revised Code Chapter 4112. *See* R.C. 4112.02(A). During the pendency of this case, the Supreme Court of the United States decided *Bostock v. Clayton County, Georgia*, --- S.Ct. ---, 590 U.S. ----, --- L.Ed.2d --- (2020) (Slip Opinion). In that decision, the Supreme Court held that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id*. at 9. Thus, the Court concluded that "[a]n employer who fires an individual merely for being gay or transgender defies the law." *Id*. at 33. Since the Ohio Supreme Court has held that federal case law is "generally applicable to cases involving alleged violations

of R.C. Chapter 4112," the type of claim that Angelina raises herein could potentially have a basis in law under Bostock. *Russel*, *supra*, at 100, quoting *Plumbers & Steamfitters Commt*. at 196. *See Bostock* at 33.

**{¶114}** However, even if there is now a legal basis for this type of claim under Ohio law, Angelina has not alleged facts that suggest that she suffered adverse employment action because of her sexual orientation.[3] In her deposition, Angelina agreed that Henry was aware of her sexual orientation at the time that she was hired; was accepting of her lifestyle; and had never expressed displeasure that she was married to a woman. Angelina Deposition, 39, 75, 77.

**{¶115}** McClain and Henry testified that they were each aware that Angelina was gay at the time that she was hired. McClain Deposition, 36, 38. Henry Deposition, 33. She also testified that McClain did not directly speak to her about her marriage or make any discriminatory slurs regarding her sexual orientation. *Id.* at 127-128. However, Angelina did state that McClain had mentioned to her father that he (McClain) was uncomfortable with Angelina referring to Vanessa as her wife. Angelina Deposition, 80. She agreed that this was "one isolated incident in 2017." *Id.* at 80. She admitted that there were no other "expression[s] of dislike or

---

[3] We note that the trial court did not grant summary judgment as to this claim on the grounds that Ohio law did not recognize discrimination on the basis of sexual orientation as actionable. Doc. 43. Rather, in its judgment entry, the trial court stated that "[t]he record lacks evidence of gender/sexual preference discriminatory intent by defendant." Doc. 43.

displeasure" with her lifestyle or her marriage. *Id.* Angelina also affirmed that no "adverse disciplinary actions were taken against" her after this incident. *Id.*

**{¶116}** In her deposition, her response to the motion for summary judgment, and her appellate brief, Angelina has not drawn a connection between her sexual orientation and any adverse employment action taken by Lima Auto Mall. Angelina Deposition, 198. Doc. 38. Appellant's Brief, 23-24. She only argues that there is a right to raise a claim for discrimination on the basis of sexual orientation under Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e, et seq. However, she does not identify facts in the record that would substantiate such a claim. Thus, her third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶117}** Angelina argues that the appellees were not entitled to summary judgment on her disability discrimination claims because there is a genuine issue of material fact as to whether she was terminated for being perceived as disabled.

Legal Standard

**{¶118}** R.C. 4112.02 prohibits certain discriminatory employment practices and reads, in its relevant part, as follows:

> **It shall be an unlawful discriminatory practice:**
>
> **(A) For any employer, because of the \* \* \* disability \* \* \* of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.**

R.C. 4112.02(A). "Since Ohio's disability discrimination statute is similar to the federal Americans with Disabilities Act, Ohio courts have considered federal cases for guidance in interpreting the Ohio statute." *Mattessich v. Weathersfield Twp.*, 2016-Ohio-458, 59 N.E.3d 629, ¶ 37 (11th Dist.).

> {¶119} The Ohio Revised Code defines the word "disability" as follows:
>
> **a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or *being regarded* as having a physical or mental impairment.**

(Emphasis added.) R.C. 4112.01(13). A "physical or mental impairment" is defined in the Ohio Revised Code as including the following:

> **(i) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genito-urinary; hemic and lymphatic; skin; and endocrine;**
>
> **(ii) Diseases and conditions, including, but not limited to, orthopedic, visual, speech, and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, human immunodeficiency virus infection, mental retardation, emotional illness, drug addiction, and alcoholism.**

R.C. 4112.01(A)(16)(a).

{¶120} If a plaintiff alleges that he or she was discriminated against by an employer because the plaintiff was disabled, then the plaintiff, in order to establish a prima facie case of disability discrimination, must demonstrate:

> **(1) she [or he] was disabled; (2) she [or he] suffered an adverse employment action based, at least in part, on that disability; and (3) she [or he] could safely and substantially perform the essential functions of the job.**

*Dunn v. GOJO Industries*, 2017-Ohio-7230, 96 N.E.3d 870, ¶ 12 (9th Dist), citing *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St.3d 569, 571, 697 N.E.2d 204, 206 (1998).

{¶121} However, "[a] person can gain the protection of the disability discrimination laws even if he or she is not disabled if the employer regards the person as being disabled." *Carnahan v. Morton Bldgs. Inc.*, 2015-Ohio-3528, 41 N.E.3d 239, ¶ 7 (3d Dist.). If a plaintiff alleges that he or she was discriminated against by an employer because that employer perceived the plaintiff as disabled, then the plaintiff, in order to establish a prima facie case of perceived disability discrimination, must demonstrate:

> **(1) that she [or he] was *perceived* as disabled, (2) that the employer took an adverse employment action against her because of the perceived disability, and (3) that the employee, although perceived as disabled, can safely and substantially perform the essential functions of the job in question.**

(Emphasis added.) *Jaber v. FirstMerit Corp.*, 2017-Ohio-277, 81 N.E.3d 879, ¶ 13 (9th Dist.), citing *Ames, supra*, at ¶ 26.

> **If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action.** ***Turner*** **[*v. Shahed Ents*., 10th Dist. Franklin No. 10AP-892, 2011-Ohio-4654.] ¶ 14. If an employer meets its burden of production, a plaintiff must prove by a preponderance of the evidence that the employer's reason was merely a pretext for unlawful discrimination.**

*Ames, supra*, at ¶ 27, citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Legal Analysis

{¶122} In her complaint, Angelina pled a perceived disability discrimination claim. Doc. 1. Further, in her motion opposing summary judgment, Angelina argued that her employer perceived her as disabled and that this perception motivated her employer to terminate her. Doc. 38. She did not argue that she was, in fact, disabled. Doc. 38. *See* Angelina Deposition, 130-131, 191, 204. Thus, Angelina raises a perceived disability discrimination claim, not a disability discrimination claim. In its judgment entry, the trial court considered this claim in the following manner:

> **After reviewing the evidentiary material in favor of plaintiff, this Court finds plaintiff has not pointed out evidence sufficient to create a genuine issue of material fact as to whether she was disabled or handicapped. Therefore, she has not presented sufficient facts to survive a summary judgment against her on her claim of disability discrimination.**

Doc. 43. The trial court granted summary judgment on this claim because Angelina had not identified evidence that she had a disability. Doc. 43. However, since

Angelina raised a perceived disability discrimination claim, she did not have to point to evidence that she actually had a qualifying disability in order to defeat summary judgment on this issue.

{¶123} Thus, the trial court applied the wrong legal standard, evaluating Angelina's perceived disability discrimination claim as a disability discrimination claim. Because the trial court did not apply the proper legal standard to Angelina's claim, we must remand this issue to the trial court for consideration under the proper legal standard. Angelina's fourth assignment of error is sustained.

*Conclusion*

{¶124} Having found no error prejudicial to the appellant in the particulars assigned and argued in the appellant's first, second, and third assignments of error, the judgment of Allen County Court of Common Pleas is affirmed as to these issues. Having found error prejudicial to the appellant in the particulars assigned and argued in the appellant's fourth assignment of error, the judgment of the Allen County Court of Common Pleas is reversed as to these issues.

*Judgment Affirmed in Part*
*Reversed in Part*
*And Cause Remanded*

**PRESTON and ZIMMERMAN, J.J., concur.**

**/hls**